UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN SAWYER PRESTON, BRIAN
ORENSTEIN and JORGE DEYARZA,

     Plaintiffs,

  v.

FT 17 LLC d/b/a VELOCE CLUB, FT 7th
AVENUE LLC d/b/a BAR VELOCE
CHELSEA, FT Café LLC BAR CARRERA
EAST VILLAGE, FT 245 CORP. d/b/a BAR
VELOCE EAST VILLAGE, GIULIETTA
MANAGEMENT CORP., FTTCCM LLC d/b/a
VELOCE PIZZERIA, WEST HOUSTON
MACDOUGAL LLC d/b/a BAR CARRERA
GREENWICH VILLAGE, and FREDERICK
TWOMEY,

     Defendants.

No. 11-civ-2556 (WHP)

 

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Kristine A. Sova
Law Office of Kristine A. Sova
411 Lafayette Street, 6th Floor
New York, NY 10003
Tel. (646) 558-2296

*Attorney for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

    I.      Background of Defendants ...................................................................................... 2

    II.    Plaintiffs Were Bartenders and Each Sought to Invest and Partner in
          Defendants' Bars............................................................................................. 3

    III.   Bartender and Barback Compensation........................................................... 4

    IV.   Evidence Shows that Plaintiffs Did Not Work the Hours Claimed .............. 7

ARGUMENT .............................................................................................................................. 9

    I.      Standard on a Motion for Summary Judgment ............................................ 9

    II.    There Are Issues of Fact as to Whether Plaintiffs Worked the Hours They
          Now Claim were Unpaid .............................................................................. 10

    III.   Summary Judgment on Plaintiffs' Claim for Spread-of-Hours is Inappropriate
          Because There Are Issues of Fact as to Whether Plaintiffs' Workdays
          Exceeded 10 Hours ....................................................................................... 18

    IV.   Summary Judgment in Favor of Plaintiffs on Their Tip-Based Claims Should
          be Denied as a Matter of Law ...................................................................... 19

    V.     Plaintiffs are not Entitled to Summary Judgment on Limitations Periods and
          Liquidated Damages that are Premised on a Finding of Willfulness and/or a
          Lack of Good Faith ....................................................................................... 23

CONCLUSION.......................................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986) ...................................................... 10, 11

*Bensen v. American Ultramar*,
    No. 92 Civ. 4420 (KMW)(NRB), 1996 U.S. Dist. LEXIS 10647 (S.D.N.Y. July 26,
    1996) ......................................................................................................................... 14

*Blanc v. Safetouch, Inc.*,
    No. 3:07-cv-1200-J-25TEM, 2008 U.S. Dist. LEXIS 68158 (M.D. Fla. Apr. 26, 2008) ....... 24

*Brumbelow v. Quality Mills*,
    462 F.2d 1324 (5th Cir. 1972) ............................................................................... 14

*Cao v. Wu Liang Ye Lexington Rest., Inc.*,
    No. 08 Civ. 3725 (DC), 2010 U.S. Dist. LEXIS 109373 (S.D.N.Y. Sept. 30, 2011) ....... 22, 23

*Chan v. Sung Yue Tung Corp.*,
    No. 03 Civ. 6048 (GEL), 2007 U.S. Dist. LEXIS 7770 (S.D.N.Y. Feb. 1, 2007) .................. 23

*Copantitla v. Fiskardo Estiatorio, Inc.*,
    788 F.Supp.2d 253 (S.D.N.Y. 2011) ........................................................................ 22

*Cross v. 440 Corp.*,
    No. 2:06-CV-0191-WCO (N.D. Ga. Sept. 24, 2008) ............................................................. 23

*Duncan v. Brockway Standard, Inc.*,
    No. 1:90-cv-2867-GET, 1992 U.S. Dist. LEXIS 21165 (N.D. Ga. Sept. 19, 1992) ............... 15

*Fujun Jiao v. Shi Ya Chen*,
    No. 03 Civ. 165, 2007 U.S. Dist. LEXIS 96480, 2007 WL 4944767 (S.D.N.Y. March
    30, 2007) .................................................................................................................... 10

*G.K. Alan Assoc., Inc. v. Lazzari*,
    44 A.D.3d 95 (2d Dept. 2007) ............................................................................... 18

*Interpool Ltd. v. Patterson*,
    874 F.Supp. 616 (S.D.N.Y. 1995) ........................................................................ 18

*Jin v. Pacific Buffet House, Inc.*,
    No. CV-06-579 (VVP), 2009 U.S. Dist. LEXIS 74901 (E.D.N.Y. Aug. 24, 2009) ......... 10, 11

*Markbreiter v. Feinberg*, No. 09 Civ. 5573 (LAK),
   2010 U.S. Dist. LEXIS 7549 (S.D.N.Y. Jan. 29, 2010).......................................................... 17

*Oldham v. United States Postal Serv.*,
   No. 10-5767, 2012 U.S. App. LEXIS 3784 (6th Cir. Feb. 23, 2012) ...................................... 16

*Overton v. N.Y. State Div. of Military & Naval Affairs*,
   373 F.3d 83 (2d Cir. 2004)....................................................................................................... 10

*Park v. Seoul Broad. Sys. Co.*,
   No. 05 CV 8956 (BSJ)(DFE), 2008 U.S. Dist. LEXIS 17277 (S.D.N.Y. Mar. 2, 2006) ....... 24

*Phansalkar v. Anderson Weinroth & Co.*, L.P.,
   344 F.3d 184 (2d Cir. 2003)..................................................................................................... 17

*Rivera v. Ndola Pharmacy Corp.*,
   497 F.Supp.2d 381 (E.D.N.Y. 2007) ....................................................................................... 11

*Rodriguez v. Modern Handling Equip. of NJ, Inc.*,
   604 F. Supp. 2d 612 (S.D.N.Y. 2009)...................................................................................... 14

*Samiento v. World Yacht Inc.*,
   10 N.Y.3d 70, 854 N.Y.S.2d 83, 883 N.E.2d 990 (N.Y. 2008).............................................. 22

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
   391 F.3d 77 (2d Cir. 2004)....................................................................................................... 10

*Sista v. CDC Ixis N. Am., Inc.*,
   445 F.3d 161 (2d Cir. 2006)....................................................................................................... 9

*Stephens v. Alken Tours, Inc.*,
   780 F.Supp.2d 309 (E.D.N.Y. 2011) ....................................................................................... 14

*Wicaksono v. XYZ 48 Corp.*,
   No. 10 Civ. 3635 (LAK)(JCF), 2011 U.S. Dist. LEXIS 55771  (S.D.N.Y. May 2,
   2011) ........................................................................................................................................ 10

## **Statutes**

N.Y. Lab. Law § 196-a ................................................................................................................. 11

N.Y. Labor Law § 195(4) ............................................................................................................. 12

## **Other Authorities**

U.S. Department of Labor Opinion Letter dated May 14, 2007, 2007 DOLWH LEXIS 11 ........ 12

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 9

Fed. R. Evid. 801(d)(2)(D) ................................................................................................ 14

**Regulations**

29 C.F.R. § 516.2 .............................................................................................................. 12

29 C.F.R. § 516.2(a)(7)...................................................................................................... 11

## PRELIMINARY STATEMENT

Plaintiffs John Sawyer Preston, Brian Orenstein and Jorge Deyarza have moved for partial summary judgment seeking a finding that, among other things, Defendant Frederick Twomey was their employer, and all of the corporate defendant entities, with the exception of West Houston MacDougal, LLC (defined by Plaintiffs as the "Twomey Entities"), constitute a single enterprise.  Twomey does not dispute that he was an employer, as that term is defined in the Fair Labor Standard Act ("FLSA") and New York Labor Law ("NYLL"), of the three plaintiffs.  Nor do Defendants dispute that the Twomey Entities constitute a single enterprise.

What Defendants do dispute is that Plaintiffs are entitled to summary judgment on their claims for unpaid wages, tip-based claims, or any of their claims premised on a finding of willfulness and/or lack of good faith, as those claims are riddled with material issues of fact, or otherwise fail as a matter of law, as explained in detail below.  Indeed, several of Plaintiffs' contentions are simply disingenuous and fail the test of common sense.  For example, Plaintiffs actually contend that *their own contemporaneous representations as to hours worked* (made to Defendants at the conclusion of each respective shift worked years ago) were not accurate and that, as they now recall in this Federal wage-and-hour suit, they actually worked more hours than they themselves reported at the conclusion of those nights.  A jury could plainly reject this disingenuous contention, as well as all of Plaintiffs' other contentions.

For this reason and others demonstrated below, issues of fact remain on all of Plaintiffs' claims, and their motion for summary judgment should be denied.

# STATEMENT OF FACTS[1]

## I.   Background of Defendants

With the exception of Defendant Giulietta Management Corporation, the corporate defendants, either currently or at one time, operated as wine or cocktail bars. (Twomey Dep. 25; Twomey Dec. ¶ 2.) The bar establishments include: Bar Veloce (various locations), Bar Carrera (various locations), Solex and Veloce Club. (Twomey Dec. ¶ 2.)

Defendant Frederick Twomey is a partner in all of these establishments, as well as a principal in Giulietta Management Corporation. (Twomey Dep. 13-15; Mailvaganam Dep. 8-9; Walker Dep. 9; Kaiser Dep. 126-28; Twomey Dec. ¶ 1; Kaiser Dec. ¶ 4.) In 2000, Twomey launched the Bar Veloce concept, a concept after which he patterned all of his other bars. (Twomey Dec. ¶ 3.) Except for those times when Bar Veloce experimented with the addition of another service employee, the only two types of employees who work during service are bartender(s) and barback(s); barbacks are sometimes referred to as "chefs" or "cooks." (Preston Dep. 42-43; Deyarza Dep. 83, 89; Twomey Dep. 25-26, 56; Mailvaganam Dep. 19, 45-46; Kaiser Dep. 18-19; Twomey Dec. ¶¶ 7-8; Kaiser Dec. ¶ 6.)

In 2009, Twomey closed one of his wine bars (Solex) and opened Veloce Pizzeria. (Twomey Dec. ¶¶ 2, 16.) Although the pizzeria had a small bar, it was a traditional pizzeria.

---

[1] In addition to the following summary, Defendants respectfully refer the Court to Defendants' Local Civil Rule 56.1 Counter-Statement of Undisputed Facts. Unless otherwise noted, references to supporting declarations are denoted as "[Last Name] Dec. ___" and references to transcripts of deposition testimony are denoted as "[Last Name] Dep. ___". Copies of all supporting declarations not previously submitted to the Court in conjunction with Defendants' motion for partial summary judgment [see ECF Document Nos. 53-58], are submitted herewith. The supporting declarations submitted herewith include the Declaration of Kristine A. Sova dated January 16, 2013 ("Sova Opp. Dec."), the Declaration of Frederick E. Twomey dated January 16, 2013 ("Twomey Opp. Dec."), the Declaration of Thomas Rice dated January 9, 2013, the Declaration of Wesley Maness dated January 11, 2013, and the Declaration of Amit Pandya dated January 13, 2013. Further, copies of the deposition transcripts are appended to the Declaration of Kristine A. Sova dated December 19, 2012 [ECF Document No. 54], which was submitted with Defendants' motion for partial summary judgment.

(Twomey Dec. ¶ 16.)  The pizzeria employed bartenders, who also served as waiters, and had a separate kitchen, with its own staff that did not interact with customers.  (Orenstein Dep. 57-60; Twomey Dep. 35; Twomey Dec. ¶ 16; Kaiser Dec. ¶ 7.)  For a very brief time, the pizzeria also employed barbacks in the front of the house.  (Twomey Dec. ¶ 16.)

Giulietta Management Corporation managed the "back office" of each of these establishments and was responsible for, among other things, the processing of payroll to be paid to the employees at these establishments.  (Twomey Dep. 12-13, 15-16; Mailvaganam Dep. 8-9, 47-48; Walker Dep. 8-9, 15-16; Kaiser Dep. 16-18, 127; Twomey Dec. ¶ 17; Kaiser Dec. ¶ 4.) Giulietta Management processed payroll with the aid of a professional payroll company. (Twomey Dep. 66, 78; Twomey Dec. ¶ 17; Kaiser Dec. ¶ 11.)

## II.  Plaintiffs Were Bartenders and Each Sought to Invest and Partner in Defendants' Bars

For the most part, the three plaintiffs in this action worked as bartenders in some or all of the above establishments.  (Preston Dep. 34, 106; Orenstein Dep. 8; Deyarza Dep. 30; Twomey Dec. ¶ 18.)  Each of the plaintiffs worked for some or all of the Defendants for many years: Preston, for roughly four years; Orenstein, for roughly three-and-a-half years; and Deyarza, for roughly two-and-a-half-years.  (Preston Dep. 22, 34, 46, 91, 114; Orenstein Dep. 7-8; Deyarza Dep. 22-24, 27, 80-81; Twomey Dep. 20, 23-24; Twomey Dec. ¶¶ 19, 21, 23.)

Each of the plaintiffs also sought to invest in Defendants and/or partner with Twomey and his partner in West Houston Macdougal LLC, Stefan Mailvaganam.  Preston actually did invest in Veloce Pizzeria.  (Preston Dep. 129; Twomey Dec. ¶ 20, Ex. A.)  Orenstein sought to be in an investor in Veloce Pizzeria but did not become one because he did not have the money to invest and Twomey would not loan him the money to invest.  (Twomey Dec. ¶ 22, Ex. B.) Deyarza unsuccessfully tried to partner with Twomey and Mailvaganam on a Brooklyn wine bar project. (Deyarza Dep. 80-81; Twomey Dec. ¶ 23.)

3

### III.   Bartender and Barback Compensation

The establishments compensated their bartenders, including the plaintiffs, as follows: hourly at the reduced minimum wage for tipped workers (sometimes at a higher rate if the bartender, like some of the plaintiffs, was the head bartender), plus tips. (Preston Dep. 25, 53-54; Deyarza Dep. 62; Twomey Dep. 39; Mailvaganam Dep. 14-15, 45; Walker Dep. 18-19; Twomey Dec. ¶ 25.)   Defendants notified each of the plaintiffs of their intention to pay the reduced minimum wage for tipped workers.   (Preston Dep. 28, 30; Orenstein Dep. 13-14; Deyarza Dep. 30; Mailvaganam Dep. 14-15; Twomey Dec. ¶ 26.)   The bartenders shared their tips with barbacks and tipped out a portion of their tips to the barbacks nightly.   (Orenstein Dep. 32-33; Deyarza Dep. 54-55, 62, 85-86; Twomey Dep. 39; Mailvaganam Dep. 46-47; Twomey Dec. ¶ 27; Kaiser Dec. ¶ 6.)   Depending on whether there was one or two barbacks working, the tip out was usually 25% (for one barback) or 30% (to be split between two barbacks) of the total tips.   (Orenstein Dep. 32-33, 51-52; Deyarza Dep. 65, 85-86, 90; Mailvaganam Dep. 46-47; Kaiser Dep. 70; Twomey Dec. ¶ 27; Kaiser Dec. ¶ 6.)   The bartenders did not share their tips with any kitchen staff.   (Twomey Dec. ¶ 27; Kaiser Dec. ¶ 7.)

An important component of bartender compensation is the "guarantee" that the establishments provided.   Due to the ebbs and flows of an unstable economic environment, Defendants had a compensation guarantee policy in place for bartenders (and barbacks). (Orenstein Dep. 14, 35-36; Walker Dep. 19; Twomey Dec. ¶ 29.)   With the exception of the pizzeria, where the bartender guarantee was $150/shift, the bartender guarantee was $200 per shift.   (Orenstein Dep. 14-15, 34-35, 63-64; Deyarza Dep. 75-76; Twomey Dec. ¶ 29; Kaiser Dec. ¶ 15, Ex. E.)   The practical effect of the bartender guarantee was that, on a weekly basis, the establishments would supplement the compensation of a bartender if he did not receive the net equivalent of $200 (or $150 for bartenders working at Veloce Pizzeria) per shift after tipping out

4

the barbacks.  (Orenstein Dep. 14-15; Twomey Dec. ¶ 30; Kaiser Dec. ¶ 15, Ex. E.)   For example, if a pizzeria bartender worked 4 shifts one week, and only received the equivalent of $550 in hourly wage plus tips over the course of that week, the establishment supplemented the bartender's compensation with the sum of $50 for that week.  (Twomey Dec. ¶ 30.)

As noted above, the bartenders tipped out barbacks 25-30% nightly.  (Orenstein Dep. 32-33, 51-52; Deyarza Dep. 65, 85-86, 90; Mailvaganam Dep. 46-47; Kaiser Dep. 70; Twomey Dec. ¶ 27; Kaiser Dec. ¶ 6.)  Like the bartenders, barback compensation was comprised of hourly pay at the reduced minimum wage for tipped workers, plus tips, of which they were also notified. (Twomey Dep. 44; Mailvaganam Dep. 14-15, 46, 53, 55-56; Walker Dep. 19-20; Twomey Dec. ¶ 32.)  Aware that the amount of tips tipped out to a barback oftentimes would not provide the barbacks with a healthy living wage and to compete with other high-quality establishments, the establishments also provided a "guarantee" to the barbacks.  (Orenstein Dep. 35-36; Twomey Dep. 44-45, 48; Mailvaganam Dep. 46, 48-49, 53, 55-56; Walker Dep. 19-20; Twomey Dec. ¶ 33.)  The guarantee operated on a shift basis and varied from barback to barback, depending on length of service and skill level.  (Twomey Dec. ¶ 33; Kaiser Dec. ¶ 13.)  The intended effect of the guarantee was the same as that for the bartenders: that, on a daily basis, the establishments would supplement the compensation of a barback so that if a barback was guaranteed to net $100 minimum per shift, he would receive at least that net amount, even if the amount of tips dropped for him on a particular night would have resulted in less.  (Twomey Dec. ¶ 34.)  Indeed, Twomey devised the compensation guarantee to be "fair and equitable" to staff that worked at locations or on nights that did not generate the kind of sales that generated larger tips.  (Twomey Dep. 134.) Pursuant to this guarantee system, Twomey and his establishments supplemented, i.e., paid bartenders and barbacks, roughly $275,000 during the time periods in question.  (Twomey Dep. 44-47; Twomey Dec. ¶ 35; Kaiser Dec. ¶ 14.)

What Defendants did not realize until mid-way through discovery in this lawsuit is that Giulietta Management, through what appears to be a clerical error based on a misunderstanding by Giulietta Management's Office Manager, did not always process the barback guarantees exactly as intended. (Twomey Dep. 48, 102-04, 134; Twomey Dec. ¶ 36; Kaiser Dec. ¶ 14.) The purpose of the guarantee was to ensure a minimum amount of compensation to the barbacks, without foreclosing the possibility that a barback would receive more in tips on a particularly busy night or at a busy location. (Twomey Dep. 104; Twomey Dec. ¶ 37; Kaiser Dec. ¶ 14.) Documents and testimony indicate that barback tips were pooled, many times across multiple establishments, and then distributed to the barbacks on a bi-weekly basis, such that all of the tip money went to barbacks or other service employees, but not necessarily to the specific barback for whom the tips were dropped and not always during the appropriate pay period. (Kaiser Dep. 23-25, 84-85, 90, 98-100, 117-18.) As a result, sometimes a barback received more in tips than were actually dropped for him and sometimes a barback received less in tips than were actually dropped for him, but nevertheless always received his guarantee.[2] (Kaiser Dep. 79-80, 92.)

While this clerical error often caused no damage to barbacks (including Jose, as described in footnote 2) because their hourly wage and tips did not thrust their total compensation over the guarantee, Defendants acknowledge there could have been damage because the manner in which

---

[2] Take, for example, a barback (Jose) working at Bar Carrera on West Houston. Cash out sheets indicate that for the bi-weekly payroll period ending January 24, 2010, tips were dropped for him as follows: $52 (on January 11), $27 (on January 12), $97.65 (on January 13), $96.00 (on January 14), $118 (on January 15), $113 (on January 16), $21 (on January 18), $43 (on January 19), $53 (on January 20), $85 (on January 21), $116 (on January 22), and $137 (on January 23). The sum of these tips is $958.65. (Kaiser Dec., Ex. A [DEF 12307-12332].) Jose also received a paycheck for his hourly wage in the amount of $273.30 (net amount). (Kaiser Dec., Ex. D [DEF 12266].) Jose's compensation guarantee at this point in time was $110/shift. Since he worked 12 shifts this pay period, he should have received a minimum of $1320.00, which he did receive in this payroll period ($1320.30). (Kaiser Dec., Ex. D [DEF 12266].) As a result of the guarantee, Jose received not only received his tips and hourly wage, but $361.65 ($1320.00 - $958.65 - $273.30 = $361.65) in additional compensation as well.

6

Giulietta Management applied the tips did not factor in the precise amount of tips dropped for each barback.  (Kaiser Dec. ¶ 14.)  Defendants acknowledge this was incorrect, as it was not as intended, and have modified their method of distributing tips to barbacks.  (Twomey Dep. 104; Twomey Dec. ¶ 38.)   In addition, Defendants are currently conducting an accounting to determine the amount of tips dropped for each barback each pay period and make any damaged barbacks whole.  (Twomey Dec. ¶ 38.)

## IV.   Evidence Shows that Plaintiffs Did Not Work the Hours Claimed

As far as the bartenders' hours of work are concerned, management instructed bartenders that they would be paid for 10 hours per shift, unless a bartender noted otherwise for Giulietta Management.  (Twomey Dep. 40, 58-59, 140-141; Twomey Dec. ¶ 31.)  Bartenders, including Plaintiffs, noted differing hours on nightly cash out sheets (the functional equivalent of a closing report) submitted to Giulietta Management.   (Mailvaganam Dep. 33, 50; Walker Dep. 30; Twomey Dec. ¶ 31; Kaiser Dec., Ex. A [DEF 00557-58, 00824-25, 10811-12].)   After this lawsuit was filed, Defendants also learned that Giulietta Management did not always take note of the differing hours noted by the plaintiffs on the nightly cash out sheets and often simply paid a plaintiff 10 hours for the shift.  (Declaration of Frederick E. Twomey dated January 16, 2013 ("Twomey Opp. Dec.") ¶ 9.)  This was not as intended, as Defendants created the hours reporting system so that they could compensate employees for the hours they reported.  (Twomey Dep. 40-41, 68; Twomey Opp. Dec. ¶ 9.)  Indeed, had any of the plaintiffs brought this matter to the attention of Defendants during their employment, Defendants would have immediately remedied the situation.  (Twomey Opp. Dec. ¶ 11; see Orenstein Dep. 79 (testifying that Giulietta Management was diligent in correcting any pay discrepancies he raised.)  Defendants were in fact surprised to learn that Plaintiffs had a claim for unpaid hours of work as they never once raised the issue with Twomey, and otherwise appeared very satisfied with their employment.

7

(Twomey Opp. Dec. ¶ 10.)  Defendants now know why: *Plaintiffs were not working the hours they noted on the cash out sheets, or the additional hours they now claim.*  Instead, Defendants learned during the course of this lawsuit that all three plaintiffs were each running after-hours bars for their own self-interest, giving away Defendants' inventory free of charge to their own friends and acquaintances, without Defendants' knowledge or authorization.  (Twomey Opp. Dec. ¶ 15.)

Regular customers have submitted sworn written statements that both Preston and Deyarza locked the doors of the bar to the public at or before closing, and let friends and contacts who were already in the bar stay and continue drinking free of charge, or would let friends and other contacts not yet in the bar come in to drink, also for free.  (Rice Dec. ¶¶ 3-5; Maness Dec. ¶¶ 4-6; Pandya Dec. ¶¶ 4-5.)  As one might expect, Preston and Deyarza were also drinking with their friends and contacts.  (Rice Dec. ¶ 3; Maness Dec. ¶ 5; Pandya Dec. ¶ 4.)  In addition, Orenstein admitted at deposition that he kept the bar open past scheduled hours to serve drinks that he did not ring up.  (Orenstein Dep. 81.)

Importantly, another witness (Paul Misir), who Defendants disclosed in their initial disclosures and who previously provided to Defendants additional information regarding Preston and Deyarza, has declined to submit a sworn written statement containing such information at this juncture because he is bound by confidentiality provisions in a settlement agreement with Deyarza in another litigation.[3]  (Declaration of Kristine A. Sova dated January 16, 2013 ("Sova Opp. Dec.") ¶ 2.)  Misir was a regular customer at the Bar Veloce on Seventh Avenue when Preston and Deyarza worked there, and he hired Deyarza from Bar Veloce to work for his

---

[3] Defendants are subpoenaing Misir to testify at trial scheduled to begin February 11, 2013. Defendants are not compelling his attendance sooner or requesting an extension of the briefing schedule on the summary judgment motions because Defendants are mindful of the Court's prior indications that the February 11 trial will not be adjourned and that the Court will be deciding summary judgment motions after trial.  Accordingly, Mr. Misir's trial testimony will be part of the record to be considered on summary judgment if and when the Court turns to these motions.

company, 20@LLC.  (Twomey Opp Dec. ¶ 12; Maness Dec. ¶ 2.)  Indeed, there was at least a month where Deyarza was employed at both Bar Veloce and 20@LLC, and Deyarza himself has admitted to soliciting Bar Veloce customers to become investors in 20@LLC. (Deyarza Dep. 7, 27, 92-93; Sova Dec., Ex. A (paragraph 12 alleging that Deyarza was employed at 20@LLC beginning March 19, 2011).)

In addition to the above, Defendants have also discovered that each of the plaintiffs drank on-the-job, and that each of the plaintiffs did not charge their friends and business prospects, not to mention Defendants' customers, for drinks (both during and after hours).  (Twomey Opp. Dec. ¶¶ 15, 17, Ex. F; Rice Dec. ¶¶ 3-5; Maness Dec. ¶¶ 3-6; Pandya Dec. ¶¶ 4-5.)  Each and every one of these activities is against company policy, as Defendants do not permit the consumption of alcoholic beverages on-the-job, except for tasting wine for quality assurance (Twomey Opp. Dec. ¶ 16, Ex. E) and do not permit comping except in situations where the guest's perception of good service would be compromised (e.g., a fruit fly in a glass of wine) or with upper management approval.  (Twomey Dep. 223; Twomey Opp. Dec. ¶ 13, Ex. C-D; Preston Dep. 140-41.)

## ARGUMENT

### I.    Standard on a Motion for Summary Judgment

To prevail on a summary judgment motion, the moving party must show that "there is no genuine issue as to any material fact and that [it is] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that a 'reasonable [fact finder] could return a verdict for the nonmoving party.'"  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party,"

*Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). The court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

## II. There Are Issues of Fact as to Whether Plaintiffs Worked the Hours They Now Claim were Unpaid

Defendants have never disputed that a plaintiff is entitled to pay for all hours worked, or that a plaintiff is entitled to overtime compensation at one-and-a-half times his regular rate of pay when he works more than 40 hours in a week. Notwithstanding same, Plaintiffs are not entitled to summary judgment on their claims for unpaid wages because there is an issue of fact as to whether the plaintiffs worked the hours they now claim were unpaid.

"Under the FLSA, an employee seeking to recover unpaid wages has the burden of proving that he performed work for which he was not properly compensated." *Wicaksono v. XYZ 48 Corp.*, No. 10 Civ. 3635 (LAK)(JCF), 2011 U.S. Dist. LEXIS 55771, at *4 (S.D.N.Y. May 2, 2011) (quoting *Fujun Jiao v. Shi Ya Chen*, No. 03 Civ. 165, 2007 U.S. Dist. LEXIS 96480, 2007 WL 4944767, at *2 (S.D.N.Y. March 30, 2007)) (quotations omitted). While, as explained below, Defendants here did keep records, "[w]here an employer fails to keep and preserve the proper records, the Supreme Court has established a burden-shifting approach for making determinations of fact concerning wages paid and hours worked." *Jin v. Pacific Buffet House, Inc.*, No. CV-06-579 (VVP), 2009 U.S. Dist. LEXIS 74901, at *15 (E.D.N.Y. Aug. 24, 2009). "Under that approach, 'an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable

10

inference.'" *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)). "'The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* "New York law imposes similar burden-shifting [to the FLSA] where an employer fails to keep the required records." *Id.* at *16 (citing N.Y. Lab. Law § 196-a).

In order to avail themselves of the lighter production burden under which recollection alone is sufficient, *see Rivera v. Ndola Pharmacy Corp.*, 497 F.Supp.2d 381, 388 (E.D.N.Y. 2007), Plaintiffs have misconstrued record testimony in order to claim that Defendants did not maintain records of hours worked by the plaintiffs. (*See* Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pla. Brief"), pp. 12-13.) This is not supported by the record. Defendants did, in fact, maintain records of hours worked by the plaintiffs: nightly cash out sheets. Management instructed the plaintiffs and other bartenders that they would be paid for 10 hours per shift, unless a bartender noted otherwise for Giulietta Management. Bartenders, like the plaintiffs, noted differing hours on nightly cash out sheets (the functional equivalent of a closing report) submitted to Giulietta Management. Further, the plaintiffs did this even when the cash out sheet lacked an "hours worked" column. (*See, e.g.*, Kaiser Dec., Ex. A [DEF 00557-58].)

What Defendants did not do, during the periods of time in question, is keep a record of the precise start and stop times worked by the plaintiffs. Such level of detail, however, is not required by the FLSA or the NYLL. The FLSA regulations require that employers maintain and preserve payroll or other records containing "[h]ours worked each workday" for non-exempt employees, like the plaintiffs. 29 C.F.R. § 516.2(a)(7). Recordkeeping obligations under the NYLL during the applicable periods of time contain the same requirement. *See* N.Y. Labor Law

11

§ 195(4) (eff. Apr. 9, 2011) (employers must maintain "payroll records showing for each week worked the hours worked" and, for non-exempt employees, "the number of regular hours worked, and the number of overtime hours worked."); N.Y. Labor Law § 195(4) (requiring employers to maintain "payroll records showing the hours worked" for each employee.) As recognized by the U.S. Department of Labor, "[t]he regulations do not prescribe the method or means for recording hours worked so long as the records accurately reflect the number of hours worked each day and each week by each employee." U.S. Department of Labor Opinion Letter dated May 14, 2007, 2007 DOLWH LEXIS 11, at *2 (citing 29 C.F.R. § 516.2).

Here, the recordkeeping system was structured to automatically pay an employee for ten hours of work, unless the employee informed Giulietta Management that they worked otherwise. The cash out sheet, which was filled in by the bartender each night, was the record of him having worked that particular night. If the bartender did not note his hours, the presumption was that he worked 10 hours, and would be paid for 10 hours. The 10 hours corresponded with the establishments with the longest hours of operation. This process worked to the benefit of employees such as Plaintiffs, who apparently did not notify Giulietta when they worked less than 10 hours. (As noted below, there were nights when Plaintiffs undisputedly did work less than 10 hours.) Indeed, by comparing Plaintiffs' call-in and call-out times, as reflected in Verizon telephone records produced in this litigation (Plaintiffs' own methodology for computing hours worked), it is clear that the plaintiffs were in fact *overcompensated* for many of the shifts they worked. For example:

**Plaintiff John Sawyer Preston**

| Date | Location | Hours Noted by Plaintiff on Cash Out Sheet | Latest Verizon Call in Time | Latest Verizon Call Out Time | Difference Between Call-in and Call-out Times |
|------|----------|------|------|------|------|
| 8/28/2005 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | None (DEF 09748) | 4:43 pm (VERIZON 01495) | 1:17 am (VERIZON 01495) | 8 hours and 34 minutes |
| 9/25/2005 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | None (DEF 09784) | 4:50 pm (VERIZON 01507) | 2:03 am (VERIZON 01507) | 9 hours and 13 minutes |

**Plaintiff Brian Orenstein**

| Date | Location | Hours Noted by Plaintiff on Cash Out Sheet | Latest Verizon Call in Time | Latest Verizon Call Out Time | Difference Between Call-in and Call-out Times |
|------|----------|------|------|------|------|
| 12/4/2008 Thursday | Bar Carrera on Second Avenue (Hours of Operation: 6 pm – 2 am on weekdays) | None (DEF 04248) | 5:28 pm (VERIZON 01211) | 1:44 am (VERIZON 01211) | 8 hours and 16 minutes |
| 6/22/2009 Monday | Bar Carrera on Second Avenue (Hours of Operation: 6 pm – 2 am on weekdays) | None (DEF 11650) | 5:29 pm (VERIZON 01280) | 1:48 am (VERIZON 01281) | 8 hours and 19 minutes |
| 4/13/2010 Tuesday | Bar Carrera on Second Avenue (Hours of Operation: 6 pm – 2 am on weekdays) | None (DEF 12020) | 5:30 pm (VERIZON 01365) | 1:46 am (VERIZON 01366) | 8 hours and 16 minutes |

**Plaintiff Jorge Deyarza**

| Date | Location | Hours Noted by Plaintiff on Cash Out Sheet | Latest Verizon Call in Time | Latest Verizon Call Out Time | Difference Between Call-in and Call-out Times |
|------|----------|------|------|------|------|
| 1/26/2009 | Bar Carrera on West Houston (Hours of Operation: 5 pm – 2 am) | None (DEF 10885) | 4:59 pm (VERIZON 00636) | 2:14 am (VERIZON 00636) | 9 hours and 15 minutes |
| 9/3/2009 | Bar Carrera on West Houston (Hours of Operation: 5 pm – 2 am) | None (DEF 11045) | 4:27 pm (VERIZON 00669) | 1:54 am (VERIZON 00669) | 9 hours and 27 minutes |

(Sova Opp. Dec., Ex. B-C.)

13

More problematic for Plaintiffs is that they actually contend that the cash out sheets, *which contain their own contemporaneous representations as to hours worked*, are not accurate records of their time. Indeed, Plaintiffs now contend that, at the end of each nightly shift back in (for example) 2009, they willingly reported fewer hours than actually worked. And now, during a Federal court litigation in 2013, they claim to recall that they actually worked more hours on those nights – hours they should have reported on those contemporaneous cash out sheets back in 2009. Setting aside the obvious absurdity of this contention, Plaintiffs' representations in the cash out sheets they filled out and submitted are party admissions admissible for the truth asserted therein under Fed. R. Evid. 801(d)(2)(D). *See Rodriguez v. Modern Handling Equip. of NJ, Inc.*, 604 F. Supp. 2d 612, 622 (S.D.N.Y. 2009) ("[s]ince plaintiff is a party to the lawsuit, . . . his statements in the OSHA report, if they are legible, may come in as a non-hearsay party admission under 801(d)(2)(B)."); *see also Bensen v. American Ultramar*, No. 92 Civ. 4420 (KMW)(NRB), 1996 U.S. Dist. LEXIS 10647, at \*35 (S.D.N.Y. July 26, 1996) (finding that "statements contained in [certain] Documents are party admissions pursuant to Rule 801(d)(2)(D)").

Indeed, each Plaintiff filled out a cash out sheet on each night worked and made representations to their employer as to their hours of work on those cash out sheets. Plaintiffs cannot now seriously contend that they are entitled to recover more hours of work than they noted on the cash out sheets. Their prior, contemporaneous statements (all admissible as party admissions) preclude this disingenuous maneuver. *See, e.g., Stephens v. Alken Tours, Inc.*, 780 F.Supp.2d 309, 311-12 (E.D.N.Y. 2011) (contemporaneous records regarding hours trump exaggerated after-the-fact testimony); *see also Brumbelow v. Quality Mills*, 462 F.2d 1324, 1327 (5th Cir. 1972) (court properly held that the appellant was estopped and could not profit from her own wrong in furnishing false data to the employer).

14

But even these contemporaneous records do not resolve the issue of whether the plaintiffs were in fact working additional hours for which they were not paid. *See, e.g., Duncan v. Brockway Standard, Inc.*, No. 1:90-cv-2867-GET, 1992 U.S. Dist. LEXIS 21165, at *3-4, 21 (N.D. Ga. Sept. 19, 1992) (denying summary judgment where defendant offered evidence that raised material issues of fact as to whether the accounting presented by plaintiff, which was based on a separate contemporaneous record, was an accurate reflection of hours worked). As noted above, after this lawsuit was filed, Defendants learned that Giulietta Management did not always take note of the differing hours noted by the plaintiffs on the nightly cash out sheets and often simply paid a plaintiff 10 hours for the shift. This was not as intended, as Defendants created the hours reporting system so that they could compensate employees for the hours they reported. Indeed, had any of the plaintiffs brought this matter to the attention of Defendants during their employment, Defendants would have immediately remedied the situation. Defendants were in fact shocked to learn that the plaintiffs had a claim for unpaid hours of work as they never once raised the issue with management. Defendants now know why: *Plaintiffs were not working the hours they noted on the cash out sheets, or the additional hours they now claim.* Instead, all three plaintiffs were each running after-hours bars for their own contacts, giving away and otherwise consuming Defendants' inventory free of charge, without Defendants' knowledge or authorization.

Indeed, the above evidence regarding Preston's and Deyarza's activities while on the premises of the defendant establishments (*see* Statement of Facts, Section IV), when paired with a comparison between the work hours noted on the cash out sheets and the call-out times in the Verizon telephone records, further calls into question the veracity of the plaintiffs' representation as to hours of work on the cash out sheets. In each of the examples below (of which there are many more), Preston and Deyarza each represent that they worked 11 hours on the dates noted.

15

However, the call out times on the Verizon telephone records vary widely, some as early as 12:09 am and others as late as 6:06 am.  Naturally, this would lead any fact finder to question how each of these two plaintiffs worked 11 hours on each of these days, if they indeed even worked 11 hours at all.  *See, e.g.*, *Oldham v. United States Postal Serv.*, No. 10-5767, 2012 U.S. App. LEXIS 3784, at *13 (6th Cir. Feb. 23, 2012) (rejecting the premise that "any time one is at work outside of one's scheduled or reported work hours, one is entitled to overtime . . .").

**Plaintiff John Sawyer Preston**

| Date | Location | Hours Noted by Plaintiff on Cash Out Sheet | Latest Verizon Call Out Time |
|------|----------|--------------------------------------------|------------------------------|
| 10/29/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 01757) | 2:33 am (VERIZON 01978) |
| 10/30/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 01759) | 5:05 am (VERIZON 01978) |
| 12/21/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 10553) | 2:59 am (VERIZON 01991) |
| 12/24/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 10555) | 12:09 am (VERIZON 01992) |
| 12/31/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 10559) | 1:33 am VERIZON 01994) |
| 1/29/2010 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 10587) | 5:10 am (VERIZON 02000) |
| 2/2/2010 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | None (DEF 10591) | 5:01 am (VERIZON 02001) |

**Plaintiff Jorge Deyarza**

| Date | Location | Hours Noted by Plaintiff on Cash Out Sheet | Latest Verizon Call Out Time |
|------|----------|--------------------------------------------|------------------------------|
| 11/15/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 11097) | 2:57 am (VERIZON 01982) |
| 11/21/2009 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 11106) | 6:06 am (VERIZON 01984) |
| 8/22/2010 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 11349) | 2:55 am (VERIZON 02051) |
| 11/30/2010 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 02629) | 3:10 am (VERIZON 02076) |
| 12/6/2010 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 02636) | 2:58 am (VERIZON 02077) |
| 3/9/2011 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 00952) | 5:27 am (VERIZON 02098) |

| Date | Location | Hours Noted by Plaintiff on Cash Out Sheet | Latest Verizon Call Out Time |
|------|----------|--------------------------------------------|------------------------------|
| 3/14/2011 | Bar Veloce on Seventh Avenue (Hours of Operation: 5 pm – 3 am) | 11 (DEF 00651) | 3:15 am (VERIZON 02099) |

(Sova Opp. Dec., Ex. B-C.)

In addition to the above evidence, there is ample evidence that the plaintiffs were drinking on-the-job; not charging their friends and business prospects, not to mention Defendants' customers, for drinks (both during and after hours); and using their employment with Defendants to advance other interests, such as an unrelated business like 20@. Not only were all of these activities – as well as the activities of Preston and Deyarza outlined above – against company policy and evidence that Plaintiffs were not working the hours they now claim to have worked, but these activities also constituted a breach of the duty of loyalty that employees owe to their employer. Indeed, one of Defendants' principle defenses in this action is premised on the well-established faithless servant doctrine. Under that doctrine, "an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Phansalkar v. Anderson Weinroth & Co.*, L.P., 344 F.3d 184, 200 (2d Cir. 2003) (quotations and citation omitted). "'One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation.'" *Id.* (citation omitted). Under the faithless servant doctrine, faithless employees like Plaintiffs "forfeit the right to compensation, at least for services that are tainted by the dishonesty and perhaps more broadly." *Markbreiter v. Feinberg*, No. 09 Civ. 5573 (LAK), 2010 U.S. Dist. LEXIS 7549, at *4-5 (S.D.N.Y. Jan. 29, 2010) (faithless servant is an affirmative defense, based "on a theory of recoupment or setoff," to an action to recover for wage-and-hour violations). In the employment context (such as that here), unlike situations where compensation

17

is specifically segmented by contract for specific tasks, i.e., commissions, the faithless servant forfeits all compensation. *See G.K. Alan Assoc., Inc. v. Lazzari*, 44 A.D.3d 95, 104 (2d Dept. 2007) (a faithless servant forfeits all compensation in an employment situation where the relationship was "limited to a single purpose"); *see also Interpool Ltd. v. Patterson*, 874 F.Supp. 616, 621 (S.D.N.Y. 1995) ("that a faithless agent is not faithless in each and every aspect of the agent's actions does not mean that the agent is entitled to compensation for those aspects of the agent's activities which were not themselves disloyal.").

For this and the many other reasons noted above, it is clear that Plaintiffs' claims relating to hours of work are riddled with material issues of fact, thereby rendering summary judgment inappropriate.

### III.   Summary Judgment on Plaintiffs' Claim for Spread-of-Hours is Inappropriate Because There Are Issues of Fact as to Whether Plaintiffs' Workdays Exceeded 10 Hours

Defendants do not dispute that, during the periods of time in question, they did not pay Plaintiffs spread-of-hours pay under New York law.  (Twomey Dep. 76.)  However, as set forth on pages 12-17 of Defendants' memorandum of law in support of their motion for partial summary judgment [ECF Document No. 57], Plaintiffs were not entitled to spread-of-hours pay prior to January 1, 2011, the date when a new wage order affecting the restaurant industry went into effect.  In the interest of efficiency, Defendants incorporate the arguments set forth on pages 12-17 of Defendants' memorandum of law in support of their motion for partial summary judgment into this opposition.  Also in the interest of efficiency, Defendants will address, in their reply papers, any arguments advanced by Plaintiffs in their initial moving papers that bear on Defendants' spread-of-hours argument.  However, in addition to not being entitled to spread-of-hours pay prior to January 1, 2011, there is another reason Plaintiffs' motion for summary

judgment on this issue should be denied.  That is, that as highlighted above in Section II, there are material issues of fact as to whether the plaintiffs' workdays actually exceeded 10 hours.

**IV.   Summary Judgment in Favor of Plaintiffs on Their Tip-Based Claims Should be Denied as a Matter of Law**

Defendants have also moved for summary judgment on the plaintiffs' tip-based claims that are premised on Defendants' former method of distributing tips to tip-eligible employees, seeking a dismissal of the claim as a matter of law.  Due to the overlap in much of the legal analysis, and in the interest of efficiency, Defendants incorporate, into this opposition, the arguments set forth on pages 17-21 of Defendants' memorandum of law in support of their motion for partial summary judgment.  Above and beyond those reasons set forth in Defendants' motion as to why summary judgment should be granted in favor of Defendants – not Plaintiffs – on this issue, there are a number of other reasons why Plaintiffs' motion for summary judgment should be denied on this particular issue.

First, Plaintiffs' theory of recovery is premised on a distortion of the factual record.  In their moving papers, Plaintiffs argue: "Although Defendants contend that the set aside tips were distributed to the barbacks/panini chefs, the undisputed facts show that, as a matter of law, no tips were distributed to the barbacks/panini chefs, and Defendants in fact retained Plaintiffs' set aside tips."  (Pla. Brief, p. 17.)  Further, on pages 17-18 of their moving papers, Plaintiffs, without citation to any record evidence, suggest that the clerical error that resulted in barbacks receiving only their guarantee each week was somehow intentional because the unintended pooling of tips across locations meant that "if one venue had a very good night and generated a lot of tips, that venue's set aside tips could make up for a poor night at that venue or another venue."  (Pla. Brief, p. 18.)  Each of these statements misrepresents the record.

What the record really reflects is that there were three components to barback compensation: specifically, (1) an hourly wage and (2) tips, which, if the two combined did not

19

meet or exceed the barback's guarantee, then (3) supplemental compensation from Defendants to ensure that the barbacks met their guarantee. (Twomey Dep. 44; Mailvaganam Dep. 14-15, 46, 53, 55-56; Walker Dep. 19-20; Twomey Dec. ¶ 32.)  Defendants' intent was to ensure that barbacks received a minimum amount of compensation without foreclosing the possibility of earning more.  Tips were always distributed to barbacks and other service employees, but because of the clerical error noted above, the tips did not necessarily go to the specific barback for whom the tips were dropped and the tips were not always distributed during the appropriate pay period.  The result was that there were times that a barback received more in tips than were dropped for him and also times that a barback received less in tips than were dropped for him, but nevertheless always received his guarantee.  However, the result of this was not, as Plaintiffs disingenuously contend, that barbacks did not receive tips or that Defendants retained them.  In fact, no portion of the tips was retained by Defendants as profit, nor was any portion of the tips used for operating costs. (Kaiser Dec. ¶ 10.)

In their moving papers, Plaintiffs accuse Defendants of "attempt[ing] to shoehorn their practices into compliance with the law", thereby suggesting that Defendants all along intended to pay barbacks only their guarantees. (See Pla. Brief, p. 2.)  There is no support in the record for this contention.  Indeed, Twomey only found out at his deposition in April 2012 that barback compensation was not being distributed as intended. (Twomey Dec. ¶ 36.)  This is why, earlier in that same deposition, Twomey testified that, for barbacks, there was an hourly wage plus tips, and then he would supplement the difference to meet the guarantee if necessary when the hourly wage plus tips did not meet or exceed the guarantee. (Twomey Dep. 46.)  Twomey also testified that the very nature of the guarantee was to cover for the bad weeks, where the tips resulted in less than the guarantee, but that when the tips were high, that the barbacks were to receive them. (Twomey Dep. 104.)  It was for this reason why Twomey could not explain, when presented

with documents showing how the barback tips were distributed, why the tips were distributed in the fashion they were, *see* Twomey Dep. 104-05, and testified that there must have been at least one instance of a barback making more than the guarantee. (Twomey Dep. 48.)

Further, this is not a case where the employer required bartenders to remit to it a set percentage of their tips every night without regard to whether the bartenders had the support of a barback on a particular night or in order to fund other expenses. It was for that reason that bartenders tipped out 25% if there was one barback working and 30% if there were two barbacks working, the latter percentage to be split equally between the two barbacks. (Orenstein Dep. 32-33, 51-52; Deyarza Dep. 65, 85-86, 90; Mailvaganam Dep. 46-47; Kaiser Dep. 70; Twomey Dec. ¶ 27; Kaiser Dec. ¶ 6.) It was also for this reason that tips were dropped for the specific barback(s) working, and that the bartenders indicated on the cash out sheets the barback's name and percentage of tips being allocated to the barback. (*See, e.g.*, Kaiser Dec., Ex. A [DEF 00824 (30% tip out to Roberto and Eric)], [DEF 10811 (30% tip out to Nonie and Ramon], and [DEF 12307 (25% tip out to Jose)].) Further, the tips were declared as income to each of the barbacks, commensurate with the amounts dropped for them. (Walker Dep. 14-15; Kaiser Dep. 29-30, 35; Kaiser Dep., Ex. 1-2; Kaiser Dec., Ex. A-C.) That the tips were distributed incorrectly – while an unfortunate and unintentional result that will soon be remedied by Defendants – does not support Plaintiffs' conclusory statement that no tips were distributed to the barbacks or that Defendants retained the tips. The above are all important points because, unlike in each of the cases that Plaintiffs cite in support of their motion for a liability finding on their tip-based claims, those cases each involved tips intentionally being taken from tipped employees to fund the compensation of non-tipped workers. To this point, Defendants discuss each of the cases that Plaintiffs cite in turn.

21

In *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F.Supp.2d 253, 272 (S.D.N.Y. 2011), the plaintiffs argued that automatic banquet service charges that the defendant restaurant charged to banquet patrons were actually gratuities belonging to the plaintiffs, based on how the charges were described to the restaurant's patrons. *Id.* The restaurant, having previously deemed the automatic banquet service charges as properly belonging to the restaurant, retained those charges and used them to pay for items like marketing and promotion, the wages of temporary non-tipped workers hired to assist at banquets, and to provide additional compensation to the banquet manager. *Id.* at 273. The *Copantitla* court conducted an analysis under the landmark decision in *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 854 N.Y.S.2d 83, 883 N.E.2d 990, 996 (N.Y. 2008), where the New York Court of Appeals held that, under NYLL § 196-d, service charges may be considered gratuities and cannot be retained by the employer unless certain requirements are met. 788 F.Supp.2d at 282-87. The *Copantitla* court concluded that the automatic banquet service charges were gratuities, and on that basis, found the defendants liable for violations of NYLL § 196-d. *Id.* at 286-87. *Copantitla* is nothing like the present case, which does not involve service charges; employers intending to, and in fact, retaining the charges; and distribution of the charges to non-tipped workers.

The decision in *Cao v. Wu Liang Ye Lexington Rest., Inc.*, No. 08 Civ. 3725 (DC), 2010 U.S. Dist. LEXIS 109373 (S.D.N.Y. Sept. 30, 2011), is also readily distinguished. *Cao* arose in the context of a damages application on a default judgment. *Id.* at *1-2. Although two of the individual defendants submitted opposition to the plaintiffs' damages application, defendants did not challenge plaintiffs' calculation of damages relating to the waiters' remittance of 12-15% of their tips. *Id.* at *2, 12. It was against this backdrop that the court simply stated that the remittance by the waiters to defendants of 12-15% of their tips "to pay the busboys' wages,

22

thereby impermissibly transfer[ed] money from waiters to busboys to support the busboys' base pay." *Id.* (emphasis added).

Finally, in *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 U.S. Dist. LEXIS 7770 (S.D.N.Y. Feb. 1, 2007), the court determined, after trial, that management used money from the tip pool to pay a portion of the roughly $9.00/hour paid to part-time employees, and on this basis, held that management was not entitled to take a tip credit under the FLSA. *Id.* at *11, 49. Notably, the court pointed out that "[t]hese workers were not paid in tips, but with an hourly wage" only. *Id.* at *49.

The decision in *Cross v. 440 Corp.*, No. 2:06-CV-0191-WCO (N.D. Ga. Sept. 24, 2008), which Defendants have already gone to great lengths to distinguish from the present case on pages 19-21 of Defendants' memorandum of law in support of their motion for partial summary judgment, is no different. In *Cross*, the defendant automatically collected 2.5% of each server's gross sales at the end of each shift to pay hourly wages and salaries of employees who did not receive tips. *Id.* *2, 13. Further, unlike the present case, it was the employers' intended policy in *Cross* to pay the food runners and servers fixed salaries, instead of requiring them to rely on tips contributed from servers. *Id.* *2.

Plaintiffs having premised their theory of legal recovery on facts that do not exist in this case, this Court should deny Plaintiffs' motion for summary judgment on this issue.

**V.    Plaintiffs are not Entitled to Summary Judgment on Limitations Periods and Liquidated Damages that are Premised on a Finding of Willfulness and/or a Lack of Good Faith**

Plaintiffs argue for a finding that Defendants acted in willful violation of the law requiring payment for all hours worked, thereby entitling them to the longer three-year statute of limitations under the FLSA and liquidated damages in the amount of 25% under the NYLL for any violations that pre-date February 23, 2010, and also for a finding that Defendants cannot

show the requisite good faith to avoid full liquidated damages for all of Plaintiffs' FLSA claims and for liquidated damages for all of Plaintiffs' NYLL claims arising on or after February 23, 2010.[4]   Summary judgment on liquidated damages and/or a longer statute of limitations is inappropriate because there are issues of fact as to whether the defendants did in fact violate the law and, as described in detail above in Section II, the plaintiffs' own wrongdoings impact their entitlement to liquidated damages. *See, e.g., Park v. Seoul Broad. Sys. Co.*, No. 05 CV 8956 (BSJ)(DFE), 2008 U.S. Dist. LEXIS 17277, at *20-21 (S.D.N.Y. Mar. 2, 2006) (recognizing that resolution of the issue of willfulness is not necessary on a motion for summary judgment where the plaintiff's claim for unpaid hours of work will proceed to trial); *Blanc v. Safetouch, Inc.*, No. 3:07-cv-1200-J-25TEM, 2008 U.S. Dist. LEXIS 68158, *5 (M.D. Fla. Apr. 26, 2008) (recognizing that the unclean hands defense allows courts to take into account a plaintiff's wrongdoing when analyzing remedies in a FLSA action).

Notwithstanding same, record evidence demonstrates that, even if Plaintiffs could establish any violations by Defendants, none was willful or in bad faith.  Specifically:

- Twomey did not know that Giulietta Management employees were not factoring in the hours noted by the plaintiffs on their cash out sheets when compensating them their hourly wages (Twomey Dep. 138; Twomey Opp. Dec. ¶ 9);

- Twomey did not receive complaints from any of the plaintiffs about unpaid hours of work (Twomey Dec. ¶ 10; Orenstein Dep. 81); and

- Twomey understood, and had reason to believe, that the plaintiffs were otherwise satisfied with their compensation, as each of them wanted to partner with him or invest in his business, and otherwise sent him glowing emails (Twomey Dec. ¶ 10, Ex. B).

Further, Plaintiffs' suggestion that Twomey and Mailvaganam had notice that they worked more than 10 hours by virtue of the call-in and call-out system, relies on backward logic because, as

---

[4] In their moving papers, Plaintiffs correctly point out that for NYLL claims arising on or after February 23, 2010, the standard for an award of liquidated damages no longer assesses a defendant's willfulness, but rather, whether the defendant had a good faith basis for believing that their practices were in compliance with the law.

far as Twomey and Mailvaganam were concerned, the plaintiffs were being compensated for all hours they reported to Giulietta.  Moreover, as far as spread of hours pay is concerned, the NYC Restaurant Owner Manual, which discussed wages and hours of work, that Twomey consulted prior to opening his first bar was silent on any spread-of-hours pay requirement.  (Twomey Dep. 76-77; Twomey Dec. ¶ 3.)  Indeed, the record is clear that Defendants are not the kinds of employers to nickel-and-dime their employees, such that any violations reek of willfulness. Quite to the contrary, Defendants supplemented bartender and barback compensation by $275,000 in guarantees.  (Twomey Dep. 44-47; Twomey Dec. ¶ 35; Kaiser Dec. ¶ 14.)  For all of these reasons, this Court should deny summary judgment to Plaintiffs on the issues of willfulness and lack of good faith.

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that this Court deny Plaintiffs' motion for partial summary judgment, insofar as it relates to a finding of liability and damages, and grant Defendants such other and further relief as this Court deems just and proper.

Dated: January 16, 2013
New York, New York

Respectfully submitted,

Kristine A. Sova
Law Office of Kristine A. Sova
411 Lafayette Street, 6th Floor
New York, NY 10003
Tel. (646) 558-2296

*Attorney for Defendants*