D26VPREA                        Argument

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JOHN SAWYER PRESTON, ET AL,

4                   Plaintiffs,

5          v.                              11 CV 02556 (WHP)

6    FT 17 LLC, d/b/a Veloce Club,
     FREDERICK TWOMEY,
7
                   Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           February 6, 2013
10                                         3:40 p.m.

11   Before:

12                    HON. WILLIAM H. PAULEY III,

13                                         District Judge

14                          APPEARANCES

15   JOSEPH HERZFELD HESTER & KIRSCHENBAUM
          Attorneys for Plaintiffs
16   BY:  DANIEL M. KIRSCHENBAUM
          MATTHEW D. KADUSHIN
17        DENISE A. SCHULMAN

18   POHL LLP
          Attorneys for Defendants
19   BY:  DAVID M. POHL
          KRISTINE A. SOVA
20

21

22

23

24

25

1                    (In open court)

2               THE DEPUTY CLERK:  Case of Preston, et al v. FT 17

3     LLC, et al.

4               Appearances for the plaintiff.

5               MR. KIRSCHENBAUM:  Maimon Kirschenbaum, Matthew

6     Kadushin, and Denise Schulman for the plaintiffs.

7               Good afternoon, your Honor.

8               THE COURT:  Good afternoon.

9               THE DEPUTY CLERK:  Appearances for the defendant?

10              MS. SOVA:  Kristine Sova.

11              MR. POHL:  David Pohl.

12              MS. SOVA:  On behalf of the defendant.

13              THE COURT:  Good afternoon.

14              I take it that the other folks at counsel table are

15    the parties in this case, that is, the three plaintiffs and the

16    principal of the defendant?

17              MR. KIRSCHENBAUM:  That's right, your Honor.

18              MS. SOVA:  That's correct, your Honor.

19              THE COURT:  All right.

20              First, thank you for agreeing on short notice to

21    change the time for the conference.  I've been working on the

22    trial of an antitrust case, and I now fully expect to complete

23    that case on Friday, so that we will be in a position to

24    proceed to trial on Monday.

25              The purpose of today's conference is to address the

dueling motions for summary judgment, the motions *in limine* in
this case, and to lay down some ground rules for the upcoming
trial.

I think I'd like to turn first to the summary judgment
motions.  And, Mr. Kirschenbaum, do you want to be heard with
respect to the plaintiffs?

MR. KIRSCHENBAUM:  Sure.

Your Honor, given that there are so many issues at
hand, would your Honor like me to just present it or do you
want to ask me questions or --

THE COURT:  Well, you state in your brief as a matter
of law that when an employer pays an employee an amount of
money that bears no relation to tips, that payment cannot
constitute a distribution of tips.

Is there case law that stands for that proposition or
are you offering that simply as a matter of logical reasoning?

MR. KIRSCHENBAUM:  Your Honor, I think that the *Chan,
Copantitla*, *Cao*, and *Cross* cases all support the notion that if
there's some other basis for how the employees' salaries
calculated, be it straight-up salary or an hourly pay,
regardless of whether that money conceptually can be traced
back to tips, that is not considered a distribution of tips.

There's also the CFR, which admittedly is sort of in a
different context, but defines the term "salary" to be a
predetermined payment that does not vary, be it on a weekly or

1  a daily basis.

2          THE COURT:  What about the fact that the barbacks were

3  regarded by everyone as tipped employees?

4          MR. KIRSCHENBAUM:  Well, not to throw a question back

5  at your Honor, but what does your Honor mean by "regarded," as

6  everyone -- regarded by who as tipped employees?

7          The barback may or may not have been tip-eligible

8  employees.  I think that both parties in this case agree that

9  that's a factual question to be determined by the jury.

10          But what I'm saying is even if the barbacks were

11  waiters, and they were completely tip-eligible employees, the

12  fact of the matter is that they did not receive tips.  And so

13  that defendants had this benefit of being able to engage in

14  some sort of contractual relationship with these barbacks which

15  says no matter what, you will be guaranteed your $100 or $120 a

16  shift; but then you just can't have it both ways and then call

17  that a distribution of tips.

18          THE COURT:  Isn't it clear here that everyone

19  understood that tips were being set aside for the barbacks?

20          MR. KIRSCHENBAUM:  Absolutely not, your Honor.

21          Plaintiffs understood that the barbacks were paid

22  shift pay, which was either a $100 a shift or $80 a shift or

23  somewhere roughly between 70 and $140 per shift.  I can't

24  present anything on the record today about what the barbacks

25  understood, but presumably the barbacks, who got paid the same

1   exact amount of money per shift each shift, thought that that's

2   what they were getting, not an amount that varied based on

3   tips.

4          Similarly, plaintiffs understood how the barbacks were

5   paid, and that's what they understood the tip pay to be.

6          And finally, Mercedes Kaiser, the woman who ran

7   defendant's payroll, understood that she was supposed to

8   multiply a barback's shift pay by the amount of shifts he

9   worked and pay him that amount irrespective of what the tips

10  were.

11         I don't think there was -- in fact, I think the

12  understanding was precisely to the contrary.

13         THE COURT:  Are you telling me that when the

14  plaintiffs wrote out the percentage of their tips they set

15  aside each night for named barbacks, that they had no

16  understanding that the barbacks were receiving their tips?

17         MR. KIRSCHENBAUM:  Sitting here today, the plaintiffs

18  still believe that the barbacks were not receiving their tips.

19  The barbacks were receiving shift pay.

20         If your Honor for a second -- I can read to you

21  from --

22         THE COURT:  Why would your clients write out

23  percentages of tips that are set aside each night?

24         MR. KIRSCHENBAUM:  Because that's what defendants

25  required them to do.  My clients made good money despite the 30

1    percent reduction of their tips, and they kept their jobs.

2            That being said, they explicitly understood that

3    barbacks got a set pay.  Sometimes --

4            THE COURT:  Didn't they understand that the barbacks

5    were being tipped --

6            MR. KIRSCHENBAUM:  No, your Honor.

7            THE COURT:  -- with that 30 percent?

8            MR. KIRSCHENBAUM:  The barbacks were not being tipped

9    with that 30 percent.  The barbacks were getting paid 100 --

10   let's call it 100 per shift or 80 per shift or 120 per shift.

11   Sometimes that was more than the tips that were left, which

12   defendants point out many times, sometimes it was less than the

13   money that the bartenders put in the safe-deposit.  Either way,

14   under no fathomable interpretation of tips did these barbacks

15   receive tips.  It simply makes no sense to say someone was

16   receiving tips, and then they get no more money or less money

17   ever for the entire period of plaintiffs' employment.

18           THE COURT:  How do your clients know that?

19           MR. KIRSCHENBAUM:  Defendants' records.

20           THE COURT:  Pardon me?

21           MR. KIRSCHENBAUM:  Defendants' records and defendants'

22   testimony.

23           THE COURT:  How do your clients know it at the time

24   that they were setting aside 30 percent of their tips for the

25   barbacks?

1          MR. KIRSCHENBAUM:  They spoke to the barbacks.

2     Barbacks told them.  I don't think it was a secret.

3          Defendants have weekend payroll reports that simply

4     show that the barbacks were making the same amount of money

5     each shift.

6          Ms. Kaiser was specifically questioned at her

7     deposition.  If all of the Bar Veloce restaurants, all of the

8     restaurants in Guilietta Management made a ton of money one

9     week, did the bartenders make any -- did the barbacks make any

10    more money than they are guaranteed?  And the answer was no.

11         So I mean the bartenders' understanding was exactly

12    consistent with the reality, which was the employer's

13    understanding, which is that barbacks' money did not vary when

14    there was more tips or less tips; and, thus, they bear no

15    relation at all to tips.

16         THE COURT:  What case law do you have where the issue

17    of willfulness and liquidated damages was decided on summary

18    judgment?

19         MR. KIRSCHENBAUM:  I'm pretty confident that the

20    *Copantitla* case -- I'm fairly confidential informant that the

21    *Copantitla* case was decided on summary judgment.  I can take --

22    if your Honor could give me a second.

23         THE COURT:  Take your time, because it sounds like a

24    hedge.

25         MR. KIRSCHENBAUM:  Your Honor, if I said it, it must

 1  say it somewhere.

 2          Frankly, your Honor, I have a case -- I don't know if

 3  it's cited in our briefs -- against *Mocha Asian Bistro*.  Again,

 4  I don't know if that's cited in our brief.  But in that case,

 5  willfulness was decided on summary judgment in the Eastern

 6  District of New York.  And similarly --

 7          THE COURT:  Who in the Eastern District decided the

 8  *Mocha* case?

 9          MR. KIRSCHENBAUM:  Judge Mauskopf, your Honor.

10          Good faith has been decided on -- liquidated damages

11  under the good faith standard has been decided on summary

12  judgment, even here, in this *Copantitla v. Fiskardo*, which was

13  decided, I believe, by Judge Holwell.

14          In this other case that I'm talking about, Judge

15  Mauskopf awarded it.  I only happen to know that because I was

16  plaintiff's counsel on that case.

17          THE COURT:  How do you respond to the defendants'

18  arguments that tips aren't to be taken into consideration for

19  spread-of-hours pay?

20          MR. KIRSCHENBAUM:  The only published decisions on

21  that, your Honor, are *Chan* and *Gin v. Specific Buffet House*.

22  And both of those cases decided exactly the opposite of what

23  defendants say, which is they did not count tips in determining

24  whether plaintiffs were entitled to spread-of-hours damages.

25          THE COURT:  Thank you, Mr. Kirschenbaum.

1              MR. KIRSCHENBAUM:  You're welcome.

2              THE COURT:  Ms. Sova?

3              MS. SOVA:  Yes, your Honor.

4              THE COURT:  Let's pick up with that point that I was

5    just concluding with.

6              Do you contend that tips are not to be included in the

7    calculation of whether plaintiffs' total wages exceeded minimum

8    wage for purposes of establishing entitlement to

9    spread-of-hours pay?

10             MS. SOVA:  Your Honor, we are contending that tips are

11   part of compensation and should be factored into the

12   spread-of-hours analysis.  We've cited quite a few decisions in

13   our moving papers, and again in a reply brief that was

14   submitted today that establishes that district courts, New York

15   State courts, the Department of Labor, all consider tips to be

16   compensation or wages, and those terms are used

17   interchangeably.

18             What I find most compelling is that the New York Labor

19   Law awards liquidated damages when wages are withheld.

20             THE COURT:  Right.

21             But do any of these decisions you're referring to, do

22   they address spread of hours?

23             MS. SOVA:  None of those decisions do address spread

24   of hours.  The decisions that I do cite state generally the

25   proposition that if compensation exceeds minimum wage,

1    overtime, and the spread-of-hours requirement, then no

2    additional spread-of-hours pay is due.

3          THE COURT:  But are there any decisions addressing the

4    spread of hours?

5          MS. SOVA:  The only decision that addresses spread of

6    hours is the *Chan* decision that plaintiffs' counsel has

7    referred to.  But I believe that there are three distinguishing

8    characteristics of that case.

9          *Chan* was decided before January 1st, 2011, when the

10   law changed.  There's a decision out of the Northern District

11   of New York that acknowledges that when that law changed, the

12   lawmakers made clear that certain people were no longer to be

13   excepted from the law.  And my read there, my logical

14   conclusion, is that if you're now no longer excepting people

15   prior to January 1st, 2011, you could except people.

16         I think another distinguishing characteristic --

17         THE COURT:  All that change in the law did was to say

18   that minimum wage doesn't matter anymore.

19         MS. SOVA:  It said, I believe, rate of pay didn't

20   matter anymore as the wages grew higher.

21         And again, you know, the difficulty here is that

22   sometime the term "wage" is used, sometime the term

23   "compensation" is used.  But I think what's really important to

24   look at, because this is the analysis of the Department of

25   Labor, and the district court and state court decisions that

1    analyzed spread-of-hours pay, is they want to make sure that

2    employees get a minimum.  And in our moving papers, because of

3    the guarantee that was in place at the defendant's

4    establishments, that minimum was always met by virtue of the

5    guarantee.

6            We're not dealing with a situation here where we have

7    hourly employees who make tips, and those tips fluctuate

8    day-to-day or week-to-week because of, you know, some variable

9    factor in the hospitality industry.  There was a floor here.

10   And because of that floor, the spread-of-hours pay was always

11   met.

12           THE COURT:  Doesn't rate of pay include tips or not?

13           MS. SOVA:  Rate of pay does not include tips.

14   Employers are allowed to take a tip credit against that rate of

15   pay; but the standard is wages and compensation.  And wages and

16   compensation is a much broader term than regular rate of pay,

17   which is typically the hourly wage.

18           THE COURT:  Is the faithless servant doctrine an

19   affirmative defense to the FLSA?

20           MS. SOVA:  It is an affirmative defense to the FLSA.

21   There is a decision.  I can't remember right now, but I will

22   find out in a minute, it's either in the Southern District or

23   the Eastern District of New York that says that the faithless

24   servant doctrine provides a setoff defense to FLSA.

25   Specifically, *Markbreiter v. Feinberg*, 2010 U.S. District Lexus

D26VPREA                         Argument

1   7549, states that the faithless servant doctrine gives rise to

2   a defense on a theory or recoupment -- theory of recoupment or

3   setoff in wage and hour actions under the FLSA and New York

4   Labor Law.

5           THE COURT:  Judge Kaplan never actually applied the

6   setoff defense there, did he?

7           MS. SOVA:  Not to my knowledge, but he did let it

8   proceed.

9           THE COURT:  What if your faithless servant defense

10  caused the plaintiffs to be paid less than minimum wage, don't

11  all workers have a right to a minimum wage under the FLSA in

12  state law?

13          MS. SOVA:  I think that's the struggle here, your

14  Honor.

15          MR. POHL:  Your Honor, if I may.

16          THE COURT:  Mr. Pohl.

17          MR. POHL:  I've come across that issue.  I think a

18  variation of what you're saying is some cases have raised the

19  issue of whether the faithless servant doctrine is in itself

20  illegal because it contradicts the provisions of the FSLA.  And

21  I looked into that, because obviously that would be important

22  here, and there is not any decision that I've been able to

23  find.

24          THE COURT:  We've been looking into it, too.

25          As a matter of sense, the FLSA is a remedial statute.

 1   And the faithless servant doctrine could undermine what is

 2   established as a public right by the FLSA.

 3            MR. POHL:  Well, your Honor, I would say in response

 4   that there is no indication in the case law that the FLSA or

 5   New York Labor Law was intended to abrogate this common-law

 6   doctrine that has evolved over decades in the State of New

 7   York.  It's been applied in various labor law contexts under

 8   ERISA, the FLSA.

 9            And so I understand the issue that we're facing, but I

10   can say only that I don't believe there is any decision

11   actually holding that; and there's no authority for that

12   proposition.  Even the courts have wrestled with it; it has

13   never been held, to my knowledge.

14            THE COURT:  Are the defendants contending that

15   activities such as drinking on the job and soliciting customers

16   entitle the defendant to a setoff of damages for failure to pay

17   overtime?

18            MS. SOVA:  Your Honor, I think that the same conduct,

19   whether it's cast as a faithless servant theory entitling the

20   defendants to a damages setoff, the same factual inquiry

21   actually goes to the heart of plaintiffs' claims.  It goes to

22   the heart of whether these employees were actually working.

23   And under faithless servant --

24            THE COURT:  That goes to the hours worked question.

25            MS. SOVA:  Sure.  Exactly.

1             And if these employees are conducting conduct that is

2    not to the benefit of the employer, then, by definition, that

3    conduct is not hours worked and they shouldn't be compensated

4    for that time.

5             For example, the after-hours bar, where defendants

6    didn't receive any income from the drinks that were given away

7    for free to customers, that's certainly not to my client's

8    benefit.

9             THE COURT:  But how would you apply such a setoff?  I

10   mean let's suppose that one of the plaintiffs helped himself to

11   a bottle of wine.  Does that permit the employer to say, all

12   right, I won't pay you $30 for hours you actually did work

13   because you helped yourself to an expensive bottle of

14   chardonnay, or maybe not so expensive.

15            MS. SOVA:  I don't think that's precisely what we're

16   contending here, your Honor.  We're looking at their conduct,

17   that they were -- whether they were taking limes from the

18   defendant's establishment and using the establishment's goods

19   for their own profit is what we're really looking at.

20            THE COURT:  How will you apply the setoff?

21            MS. SOVA:  How would we apply the setoff?

22            THE COURT:  My example, and maybe we're going to hear

23   testimony at the trial that one of the plaintiffs pops a cork

24   and helps himself and his friends to a bottle of your client's

25   finest wine.  How would I apply that setoff?

1          MS. SOVA:  Our contention is those times they were not

2    actually working, because they weren't working for the benefit

3    of the employer; they were work for their own personal benefit

4    and reaping personal profit off of that:  Giving away items for

5    free that belong to defendants to generate tips, cash tips,

6    that they kept for themselves.

7          MR. POHL:  Your Honor, if I may.

8          THE COURT:  Yes, Mr. Pohl.

9          MR. POHL:  I think an important point here is that the

10   faithless servant doctrine and the setoff that it affects is

11   not a precise dollar-for-dollar measurement.  More so when an

12   employee is identified as a faithless servant, all compensation

13   for that time period is forfeited.

14          So there is an issue here that we have with plaintiffs

15   as to when -- what that time period might be.  But it's not

16   measured by a specific bottle that was $12; therefore, I don't

17   have to pay you $12 over here.  It's more so a time period

18   during which the employee was faithless.  And as a result,

19   under the common law doctrine, all compensation for that period

20   is forfeited.

21          THE COURT:  All right.

22          But are you asking me to hold that if someone talks to

23   a customer about a new job, they should lose their pay for the

24   night?

25          MR. POHL:  No, your Honor.

1            What we are asking the Court to hold is that it's a

2      pattern and practice of behavior that over time is a pattern of

3      disloyal conduct.  And it's not simply the example you gave,

4      which is obviously a rather de minimis example, but, rather,

5      this is running an after-hours bar that's cash only for

6      friends, and the bar is closed to the public, but friends get

7      to stay and drink for free and eat for free on defendant's

8      dime.

9            THE COURT:  Right.

10            But wouldn't you have to quantify this for the jury?

11            MR. POHL:  Well, there is a threshold that I believe

12      is defined in the case law as substantial disloyalty.  It's

13      something somewhat amorphous.  But it's a question of fact for

14      the jury what constitutes substantial disloyalty.

15            THE COURT:  But how is the jury supposed to hang a

16      number on this?

17            MR. POHL:  If I'm understanding you correctly -- I'm

18      sure you'll tell me if I'm not -- I don't believe they have to

19      hang a number per se, more so a time period.

20            So we say, Okay, they were faithless during this time

21      period; and, therefore, compensation -- regardless of what that

22      number might be for this time period -- is forfeited.

23            Now, we believe that under the case law -- and I cited

24      some of these cases in our in limine motion -- because this is

25      a single contract, it is not segmentable into discrete tasks,

D26VPREA                      Argument

1    it's one big time period.  And it's not one of these cases

2    where courts have apportioned pay.  They would say, Okay, you

3    were disloyal for this week, but not this week; so, therefore,

4    we can apportion it, apportion the setoff.

5            THE COURT:  So what would that mean?  No pay for the

6    week you were disloyal?

7            MR. POHL:  In this case, it would be no pay at least

8    for all the time after the period of disloyalty.  And we would

9    contend that -- well, we would contend it would be during the

10   course of the entire employment.

11           Now, we don't have a counterclaim in this action, so

12   we can't go affirmatively and grab that money back; but we do

13   believe that our defense entitles us to not have to pay any

14   further compensation to a faithless servant during the period

15   of employment.

16           THE COURT:  If I were to disallow any payment for a

17   week of disloyal conduct and any week after that, wouldn't that

18   be countenance in a flagrant violation of the minimum wage

19   laws?

20           MR. POHL:  I don't think so, Judge.  I don't think so

21   because this gets back to the conversation we were having

22   before.

23           I understand the sort of facial appeal of that.  But I

24   don't believe it's found in the law, and I believe, in fact, it

25   is not the law, because no court has ever done it.

 1          There's a history of labor law in New York that's very

 2     strong for the employee, obviously.  And the faithless servant

 3     doctrine has been employed in a whole host of contexts.  And

 4     there's no indication anywhere that in the passing of these

 5     statutes that are at issue here, they were intended to abrogate

 6     these decades of common law.

 7          THE COURT:  Let me return for a moment to a question I

 8     asked earlier.

 9          Do the defendants contest that tips are not to be

10     included in the calculation of whether plaintiffs' total wages

11     exceeded minimum wage for purposes of establishing entitlement

12     to spread-of-hours pay?

13          MS. SOVA:  Your Honor, our contention is that the tips

14     should be included in the definition of wages or compensation

15     for purposes of making that calculation and determining --

16          THE COURT:  Do you have any case law to support that?

17          MS. SOVA:  No case law to support it.

18          We do have -- again, I cite to the New York Labor Law

19     that defines wages and applies liquidated damages, penalties in

20     the context of wages; "wages," again, synonymous with

21     "compensation."

22          This law makes no mention of the term "tip" or

23     "gratuity," but courts have consistently held that liquidated

24     damages are available for withheld tips.  It naturally follows

25     that if liquidated damages are available for withheld tips,

1    then tips are also wages and compensation, and that's why it

2    should be factored in.

3            THE COURT:  All right.  Thank you.

4            MS. SOVA:  Thank you.

5            THE COURT:  Mr. Kirschenbaum, do you want to address

6    the plaintiffs' argument about the definition of compensation?

7            MR. KIRSCHENBAUM:  Well, I mean the definition of

8    compensation is relevant for all kinds of different topics.

9            Just to start out, the spread-of-hours statute as it

10   was written before 2011 did not even address this idea that if

11   you made the minimum wage or more than the minimum wage, you

12   weren't entitled to spread of hours.  It simply said every

13   employee is entitled to spread-of-hours pay if their spread of

14   hours lasts for a period X to period Y.

15           Now, this new topic was something that was based on

16   legislative intent, and it's a case law found at exception to

17   the spread-of-hours rule.  And the only place to look to define

18   how wages should be defined for purposes of spread of hours is

19   to look at the case law regarding spread of hours.  And the two

20   cases which I've cited to your Honor, one of them being the

21   *Chan* case, which says:  "In this case, however, the plaintiff's

22   total weekly compensation did not exceed the minimum wages due

23   because the money paid from the banquet fee -- "

24           THE COURT:  Slowly.

25           MR. KIRSCHENBAUM:  "Because the money paid from the

1    banquet fee, which made up the difference between plaintiff's

2    wages and the minimum wage, was tips, not wages."

3          I just think the law is clear.  It's not really --

4    it's not an open issue.

5          THE COURT:  All right.

6          Anything further on the motions for summary judgment?

7          MS. SOVA:  Nothing here, your Honor.

8          MR. KIRSCHENBAUM:  The faithless servant argument, I

9    mean I don't know -- the real problem with it is to the extent

10   it stays in, aside for all that possible ambiguities and

11   unknown that your Honor has already identified, we simply --

12   other than a couple of random statements set forth in a

13   declaration, we would be totally disadvantaged by not having

14   been able to take any discovery on that topic.

15          We specifically asked about it at depositions, and we

16   would just be unfairly handicapped.  And obviously it's not

17   pled in the complaint.  There's an affirmative defense that

18   says the word "setoff" with no reference of the faithless

19   service doctrine, and no facts behind the faithless service

20   doctrine.

21          THE COURT:  But you understand that the defendants

22   have the right to rebut hours worked, right?

23          MR. KIRSCHENBAUM:  Sure.

24          Defendants are not rebutting hours worked; they are

25   saying plaintiffs are not entitled to be paid for their time,

1    if I heard correctly.  They are not entitled --

2             THE COURT:  They are saying your clients are not

3    entitled to be paid for their time because they weren't

4    working, they were partying with their friends at the

5    defendants' expense.

6             MR. KIRSCHENBAUM:  That's true, that that is what

7    defendants are saying.  But Mr. Twomey was asked at his

8    deposition, Are there any witnesses that will testify about

9    plaintiffs' hours worked?  And Mr. Twomey said no.

10            This is news that's sprung on us at the last minute.

11            To the extent defendants have a parade of witnesses

12   that are going to testify about some completely unidentified

13   topic, again, I think we'd be unduly prejudiced.

14            THE COURT:  No, but other witnesses were disclosed to

15   that effect, and documents were produced, weren't they?

16            MR. KIRSCHENBAUM:  Documents to the effect that my

17   clients were partying?  Those documents were produced after the

18   close of discovery.  And after those documents were produced,

19   Mr. Twomey still testified that there were no other witnesses

20   that could testify about plaintiffs' hours worked.

21            THE COURT:  And weren't there disclosures about stolen

22   wine?

23            MR. KIRSCHENBAUM:  Their last round of initial

24   disclosures?

25            MR. KADUSHIN:  Your Honor, the issue is that -- first

1   of all, there are two issues, your Honor.

2           One is the issue of stolen wine, there's nothing in

3   the record that our clients stole any wine.  The issue is that

4   our client -- anytime there's an issue of question of comp or

5   not comp, our clients filled out a receipt, wrote the receipt

6   out, and said comp.  Defendants had this in their possession

7   throughout the entire litigation.

8           What they are saying is despite the fact that our

9   clients wrote down that they were comping people and turned

10  these documents over and handed them in every night, two months

11  or three months after the close of discovery, oh, now we didn't

12  know until then.  They were in possession of all these

13  documents throughout the entire litigation; they turned them

14  over in October, right; and then said -- then asserted a new

15  defense.  And just that's not what they are saying.  They are

16  not saying our client stole any wine; they are saying our

17  clients filled out a receipt, wrote the receipt comp, and the

18  defendants didn't give them permission to do it.

19          Regarding, your Honor, the question of the hours

20  worked, just real clear, we're not saying defendants can't put

21  on witnesses to testify about that they weren't working, but

22  that's a general setoff.  It doesn't get into this question of

23  a jury instruction on the issue of disloyalty.

24          Defendants are free to bring in any witness they want

25  to say that our clients' working, but to ask of this setoff on

 1   the disloyalty is a completely different topic from the

 2   question of was our client working.

 3          And similarly, your Honor, if our client is having a

 4   conversation with a customer during hours of operation, he's

 5   working during those hours.  The notion that you can

 6   distinguish, you know, I'm talking to one customer over here

 7   about whether they like the Mets, and another customer over

 8   here about whether they do this, that somehow the content of my

 9   conversation prevents me from working is not a setoff argument.

10   That goes into a much more complicated question of regarding

11   whether or not this is a disloyalty issue.

12          And all the questions that your Honor is asking about

13   whether it undermines the FLSA, whether they are preemption

14   issues, these are subjects that would have been briefed at

15   summary judgment had the defendants actually pled, right, the

16   faithless servant doctrine as an affirmative defense.  If they

17   put it in specific facts, this issue would be ripe for summary

18   judgment, we would have moved for summary judgment on this

19   issue, and based upon your Honor's -- we would have prevailed

20   on this issue.

21          We had no basis for developing this record during the

22   course of the discovery because they just wrote setoff.  And

23   the Second Circuit is very clear, your Honor, that they have to

24   put in more than just a setoff, and they have to put the

25   underlying facts.

1           THE COURT:  All right.

2           Look, it's time to cut the Gordian Knot.

3           The parties have filed fully briefed motions for

4   summary judgment, and I've heard oral argument.  As indicated

5   at the outset of this conference, this Court is now prepared to

6   rule on the motions for summary judgment.

7           Summary judgment is appropriate where there's no

8   genuine issue as to any material fact and the movant is

9   entitled to judgment as a matter of law.  So says Rule 56(c).

10          On the uncontested issue of whether Defendant Twomey

11  was plaintiffs' employer as that term is defined under 29

12  U.S.C., Section 203(d) of the FLSA, and New York Labor Law,

13  Section 190, summary judgment is granted to the plaintiffs.

14          On the uncontested issue of whether defendants

15  Giulietta Management Corp., Veloce Club, Veloce Bar Chelsea,

16  Bar Carrera East Village, Bar Veloce East Village, and Veloce

17  Pizzeria constitute a single employer under the FLSA and New

18  York Labor Law, summary judgment is granted to plaintiffs.

19          On the issue of whether defendants are liable to

20  plaintiffs for unpaid wages, including overtime wages, this

21  Court finds that there are issues of material fact regarding

22  how many hours plaintiffs worked, and that this issue must

23  proceed to trial.  But the Court finds that plaintiffs are

24  entitled to a three-year statute of limitations period for

25  their wage and hour claims under the FLSA in light of the

undisputed facts regarding defendants' record-keeping practices

and their practice of generally paying plaintiffs for ten hours

per shift, regardless of how many hours plaintiffs noted on

nightly cashout sheets.  See the Kaiser deposition transcript

at 23 and defendants' Rule 56.1 counterstatement at Paragraph

50.

          These undisputed facts show that any violations of the

FLSA are willful as a matter of law.

          The Court also finds that plaintiffs are entitled to

the applicable liquidated damages for any unpaid wages under

the FLSA and New York Labor Law.

          As Judge Raggi noted in *Barfield v. NYC Health &*

*Hospital Corp.*, 537 F.3d 132 at 150 (2d Cir. 2008), an

employer's burden to avoid liquidated damages is "difficult,"

and "double damages are the norm and single damages the

exception."

          On the issue of whether defendants are liable for

failure to pay spread-of-hours pay under New York law, summary

judgment is granted to plaintiffs.  Defendants are liable for

spread-of-hours pay for any of plaintiffs' shifts on or after

January 1, 2011 that exceeded ten hours.  For any shifts prior

to January 1, 2011 that exceed ten hours, defendants are liable

for spread-of-hours pay if plaintiffs' total wages, including

hourly wages and any money defendants furnished pursuant to the

compensation guarantee were less than the statutory minimum

 1   wage, plus spread-of-hours pay.  Any compensation derived from

 2   tips is not to be included in this calculation.

 3           This Court also finds that plaintiffs are entitled to

 4   the applicable liquidated damages for any failure to pay

 5   spread-of-hours pay.  There's no dispute that defendants never

 6   paid plaintiffs a spread-of-hour wage, and, in fact, remained

 7   ignorant of the obligation to do so until Mr. Twomey sought

 8   legal advice on his employment obligations for the first time

 9   at the outset of this litigation.  Defendants' 56.1 statement

10   at Paragraph 53, and the Twomey deposition transcript at 76 to

11   77.  As such, defendants had no awareness of any uncertainty in

12   the law regarding whether spread-of-hours pay was due to

13   employees who made more than minimum wage, and they cannot

14   claim a good-faith basis for failing to pay such a wage when it

15   was due.

16           On the issue of whether defendants violated Section

17   203(m) of the FLSA, and Section 196-d of the New York Labor Law

18   by illegally retaining plaintiffs' tips, summary judgment is

19   granted to plaintiffs.  The undisputed facts indicate that

20   defendants illegally retained 25 to 30 percent of plaintiffs'

21   tips to pay what was essentially an operating cost, namely the

22   compensation guarantee owed to barbacks.  *See, e.g. Cao v. Wu*

23   *Liang Ye Lexington Restaurant,* 08 CV 3725 (DC) 2010 WL 4159391

24   at *4 (S.D.N.Y. September 30, 2010).

25           There, Judge Chin found illegal tip retention where

 1    tip deductions "were either kept by defendants or were used to

 2    pay the busboys' wages, thereby impermissibly transferring

 3    money from waiters to busboys to support the busboys' base

 4    pay."

 5            The barbacks were tipped employees in name only.  The

 6    undisputed facts show that in reality, they were paid a flat

 7    wage, as their compensation was "not subject to reduction

 8    because of variations in the quality or quantity of the work

 9    performed."  *See* 29 CFR Section 541.602, and defendants' 56.1

10    statement at Paragraphs 79 to 84.

11            Further, this Court finds that plaintiffs are entitled

12    to a three-year statute of limitations under the FLSA because

13    defendants' actions are willful as a matter of law and the

14    defendants are entitled to applicable liquidated damages for

15    their tip retention claims.

16            So for the foregoing reasons, plaintiffs' motion for

17    summary judgment is granted in part and denied in part.  And

18    the defendants' motion for summary judgment is denied.

19            Now, let me turn to the motions *in limine*.

20            Let me begin with the plaintiffs' motions *in limine*.

21            First, plaintiffs move to preclude defendants from

22    offering any evidence related to the faithless servant

23    doctrine, noting that defendants failed to assert the faithless

24    servant doctrine as an affirmative defense in their answer.

25            On December 21, 2012, this Court denied defendants'

1   request to amend their answer to include the faithless servant

2   doctrine as a counterclaim.  The Court's decision was based on

3   the knowledge that there is a concurrent state action between

4   the parties in which defendants are able to assert this

5   state-law-based doctrine as a counterclaim.

6          Defendants have offered no support for their

7   contention that the faithless servant doctrine is a legally

8   cognizable defense to an FLSA action other than Judge Kaplan's

9   conclusion in *Markbreiter v. Barry L. Feinberg, M.D., P.C.*,

10  that the faithless servant doctrine "gave rise to a partial

11  defense on a theory of recoupment or setoff" where defendants

12  had specifically pled it in their answer.  *See Markbreiter* at

13  2010 WL 334887 at *2 (S.D.N.Y. January 29, 2010).

14         But *Markbreiter* later settled.  And there appears to

15  be no other case in this Circuit in which the faithless servant

16  doctrine has actually been used to offset damages in a federal

17  wage and hour action.  In fact, this Court notes that there

18  appear to be substantial unsettled questions of law regarding

19  whether a state common law doctrine can effectively relieve

20  defendants of their federal and state statutory obligations to

21  pay minimum wage for every hour worked.  *See e.g. Donovan v.*

22  *Pointon,* 717 F.2d 1320 at 1323 (5th Cir. 1983); and

23  *Nebraskaland, Inc. v. Sunoco, Inc. (R&M)*, 2010 WL 5067962 at

24  *4, (E.D.N.Y. 2010).

25         Further, the Court finds defendants' boilerplate

1    setoff defense insufficient to plead what is essentially a

2    breach of fiduciary duty claim, and notes that if defendants

3    themselves considered their faithless servant defense

4    adequately pleaded, they would not have moved this Court for

5    relief to amend their answer to add an identical counterclaim

6    in the first place.  As such, defendants are precluded from

7    advancing the faithless servant doctrine as an affirmative

8    defense for the wage and hour claims.

9            However, defendants will still be permitted to

10   introduce the evidence they marshaled in support of their

11   faithless servant defense for the purpose of rebutting

12   plaintiffs' evidence on the open issue of how many hours the

13   plaintiffs worked.

14           By way of example, defendants are free to introduce

15   evidence that plaintiffs closed defendants' wine bars early to

16   entertain their friends in order to show that plaintiff worked

17   fewer than ten hours on any given night.  But the Court will

18   not permit defendants to argue that in keeping the bar open,

19   plaintiffs forfeited the right to compensation for hours worked

20   that are "tainted by the dishonesty and perhaps more broadly"

21   under the faithless servant doctrine.  See *Markbreiter* 2010 WL

22   334887 at *2.

23           Next, plaintiffs move to preclude certain witnesses

24   and witness testimony on topics they allege were not disclosed

25   to them pursuant to Rule 26; namely, testimony from barbacks on

1    their own job duties, and any testimony regarding the faithless

2    servant defense, especially from witnesses newly disclosed to

3    them.

4            With regard to the duties of the barbacks, the motion

5    is moot because the duties of the barbacks are no longer at

6    issue in this case.

7            With regard to any testimony from previously

8    undisclosed witnesses offered in support of defendants'

9    faithless servant defense, I note that I just ruled such

10   evidence will only be permitted for the purpose of showing how

11   many hours plaintiffs worked.

12           While defendants do not appear to have complied in

13   full with Rule 26, I do not find that exclusion of any witness

14   under Rule 37 is warranted.  "Imposing sanctions is a matter

15   committed to the district court's discretion, and the

16   preclusion of evidence is a drastic remedy."  *Harkabi v.*

17   *SanDisk Corp.*, 2012 WL 2574717 at *4, (S.D.N.Y. June 20, 2012).

18           It strikes this Court that witnesses such as

19   Mr. Maness will offer nothing but more of the same regarding

20   alleged afterhour parties and the like, because defendants

21   apparently made plaintiffs aware of similar witnesses in their

22   initial disclosures, and produced documents related to these

23   issues in October of 2012.  This Court finds that plaintiffs

24   have received adequate notice of defendants' intent to use such

25   evidence such that defendants' failure to disclose may be

1   deemed harmless for Rule 37 purposes.  But if plaintiffs truly

2   believe they are unduly prejudiced by the addition of

3   Mr. Maness as a witness, this Court will grant them leave to

4   depose Mr. Maness for no more than an hour before trial begins

5   on Monday, or before he's called as a witness by the

6   defendants.

7          Finally, plaintiffs seek to preclude evidence of

8   defendants' contempt motion, which this Court held in abeyance

9   pending the outcome of trial.  Plaintiffs' motion is granted.

10  The contempt motion is irrelevant to the claims at issue

11  pursuant to Rule 402.  And even if it were relevant, it would

12  be unduly prejudicial under Rule 403, because the fact of a

13  plaintiff violating a court-ordered stipulation could send a

14  false message to the jury that the Court itself is unhappy with

15  the conduct of plaintiffs or their counsel.  Therefore, there

16  is to be no mention of the contempt motion or any of the

17  allegations contained within it, including the plaintiff

18  Preston's violation of the May 2012 stipulation and any

19  allegation suggesting wrongdoing by any counsel.

20         Now, let me turn to defendants' *in limine* motions.

21         First, the defendants seek to admit a summary of phone

22  records, nightly cashout sheets, and payroll-related documents

23  totaling roughly 5700 pages.

24         I take it, Mr. Kirschenbaum, that this motion is

25  unopposed?

1          MR. KADUSHIN:  Yes, your Honor.

2          THE COURT:  Defendants' motion is granted, and the

3     summaries will be admitted into evidence.

4          Next.

5          Defendants seek permission to play video segments of

6     plaintiffs' depositions and/or read from the transcript of

7     plaintiffs' depositions during their opening statement.

8     Defendants note that the scope and extent of an opening is

9     within the control of the trial court, citing *United States v.*

10    *Millan-Colon,* 836 F. Supp. 1007 at 1014 (S.D.N.Y. 1993).

11         This Court denies the defendants' motion, especially

12    where the plaintiffs are not "unavailable" under Rule 804, and

13    will undoubtedly be called to testify live subject to full

14    cross-examination.  Allowing counsel to introduce deposition

15    testimony in an opening statement is inappropriate and

16    unwarranted.

17         And I'll turn in a few moments to how the trial will

18    be conducted, but I fix time limits on opening statements and

19    closing arguments, and counsel will abide by them.

20         Now, finally, defendants seek to preclude the

21    plaintiff Deyarza from refusing to testify in this action

22    pursuant to a nondisclosure agreement he signed with another

23    employer.  Defendants' motion is granted.  And Deyarza will be

24    called upon to testify notwithstanding the nondisclosure

25    agreement.

1          It appears that nondisclosure agreement relates only

2     to trade secrets and proprietary information.  Further, where

3     employment nondisclosure agreements involve events in the

4     workplace that are not privileged, but are relevant to

5     potential violations of federal law, this Court will not permit

6     plaintiff to remain silent.  *Cf. Chambers v. Capital*

7     *Cities/ABC, 159* F.R.D. 441 at 444 (S.D.N.Y. 1995).

8          Now, let's turn to the conduct of this trial.

9          The parties advise me in the joint pretrial order that

10    the case will take three days to try.  In view of this Court's

11    rulings, do you still anticipate that it is going to take three

12    days to try?

13         MR. KIRSCHENBAUM:  Your Honor, defendants have

14    disclosed about 24 witnesses.  So if they plan on putting all

15    of those witnesses up --

16         THE COURT:  How long is it going to take the plaintiff

17    to present the plaintiffs' case?  Don't tell me about the

18    defendants.

19         MR. KADUSHIN:  Your Honor --

20         THE COURT:  You know what?  I'm going to tell you

21    something.  There have been so many stones cast back and forth

22    between all of you and among all of you, I'm not going to

23    permit the kinds of things that have gone on and that I saw

24    going on in these depositions, especially from Mr. Preston.

25    That is not going to go on in this trial or you're going to all

 1    regret it.

 2            MR. KIRSCHENBAUM:  Understood, your Honor.

 3            THE COURT:  How long is it going to take for the

 4    plaintiffs' case?

 5            MR. KADUSHIN:  May I ask you a question, your Honor?

 6            Does your Honor envision us on the 196-d issue, if we

 7    could perhaps reach a stipulation with the defendants on the

 8    damages, it would be significantly less.  I'm just not sure --

 9    we haven't had time to think about what we have to introduce

10    that testimony or not.

11            Given that, we would put our clients on.  Our clients,

12    I would imagine, each of their directs taking approximately an

13    hour.  And I don't know if I have to put a summary witness in

14    or not for the other issues, your Honor.

15            MR. KIRSCHENBAUM:  Your Honor, if I could just sort of

16    clarify the scope of that question.

17            When we spoke last Friday, we spoke about amending the

18    jury instructions so that just decide is there liability on

19    issues XYZ, and then how many hours of work pursuant to the tip

20    credit, how much was retained in the 25 to 30 percent of tips.

21            Now that your Honor has granted summary judgment, does

22    your Honor still want us to make this case now or do you

23    want --

24            THE COURT:  This is a case now about hours worked.

25            MR. KIRSCHENBAUM:  Yes.  But there still are some

1    issues which would need to be decided regarding the damages on

2    the issues on which your Honor just decided liability.  I think

3    probably if we had a little more time, we could probably

4    stipulate on a lot of the things now that would otherwise go to

5    trial.

6         THE COURT:  Are there issues of fact relating to the

7    tips?

8         MR. KIRSCHENBAUM:  There probably won't be.  We could

9    probably agree on that.

10        THE COURT:  It would make sense to stipulate to that.

11        MR. KIRSCHENBAUM:  We'd love to.

12        THE COURT:  It would make greater sense to settle the

13   case.

14        MR. KIRSCHENBAUM:  At this point, certainly would.

15        Does your Honor want us to sit down and see if we

16   could stipulate?  I think we might need some time, only because

17   I don't --

18        THE COURT:  Of course I want you to sit down and try

19   to stipulate.  And I would let you use the jury room here, but

20   it's full of antitrust documents.  You can work right here.

21        MR. KIRSCHENBAUM:  Sure.

22        What I'm getting at is it sounds like the only

23   liability question or the only real open question is how many

24   unpaid hours there are.

25        That being said, in order to reach an actual verdict,

 1   we still also need to determine even for how many spread of

 2   hours shift there were, how much money was in the 25 to 30 --

 3   how much money it was.  It was just simply -- we were before

 4   planning on having a jury decide that; but now that the

 5   liability is decided, I think we'd probably agree.  We could

 6   probably agree to that.  We might even be able to come up with

 7   a settlement compromise as to how long each shift lasted so

 8   that we take a little hit on that and defendants give up a

 9   little bit on that.  I'm guessing we could probably resolve

10   this whole thing.

11            We're sort of under the gun, and we have jury

12   instructions submitted to your Honor right now which really

13   don't reflect the decision we just got.

14            What I'm saying is I think we need a little bit more

15   time.

16            THE COURT:  You're going to prune them, okay.

17            MR. KIRSCHENBAUM:  Yeah.

18            THE COURT:  This is a three-day trial.  You submitted

19   60 pages in jury instructions.

20            MR. KIRSCHENBAUM:  I think at this point there is

21   going to be a lot less in jury instructions.  I think if we

22   could --

23            THE COURT:  There is going to be a lot less.

24            MR. KIRSCHENBAUM:  If we could -- my guess is is that

25   if we weren't under the gun to get ready for trial by Monday

1    morning, we'd probably have this resolved by next week.

2              THE COURT:  Well, you're under the gun because we're

3    picking a jury on Monday morning.  Because from what I've

4    seen -- and it's absurd -- both sides here, all they want to do

5    is hurl mud at each other.  That's all they want to do.

6              It will be a very entertaining trial for the jury.

7    Very entertaining.  They will hear about all of the shenanigans

8    going on, okay.  And I'm not going to put up with any

9    shenanigans from these witnesses and the parties.  There will

10   be none.  Because the moment it happens, you will regret it.

11             MR. KIRSCHENBAUM:  Fair enough, your Honor.

12             The primary liability issues are pretty much decided.

13   So I really am hopeful -- and I haven't heard anything from

14   defendants' counsel, but I'm pretty hopeful we should be able

15   to stipulate at this point.

16             The 25 to 30 percent that was retained in tips which

17   your Honor just granted summary judgment in our favor

18   comprises, I would say, 70 -- together with the tip credit,

19   comprises more than three-quarters of the damages in this case.

20   So at this point, I mean something big just changed.

21             THE COURT:  Look, at most this is a three-day trial;

22   correct?

23             MR. KADUSHIN:  That's correct, your Honor.

24             THE COURT:  All right.

25             We're going to pick the jury on Monday morning.

1           You can have a seat, gentlemen.

2           We're going to pick a jury on Monday morning.  I'll

3    impanel eight jurors for this case.

4           I will ask each side to stipulate here and now to a

5    unanimous jury of as few as six, meaning that if we lose one or

6    two jurors over the course of a three-day trial, which will be

7    a four-day trial, because Tuesday, February 12 is a court

8    holiday, and we won't be sitting on Lincoln's Birthday, that

9    we'll still go forward with a verdict so long as we have six

10   jurors and they are unanimous.

11          Is that stipulated?

12          MR. KADUSHIN:  Yes, your Honor.

13          And if there were eight jurors, it would still be

14   unanimous.

15          THE COURT:  If all eight, it has to be unanimous.  But

16   a jury as few as six.

17          MR. KADUSHIN:  We have no objection to that, your

18   Honor.

19          THE COURT:  Any objection?

20          MS. SOVA:  We're fine with that, your Honor.

21          THE COURT:  All right.

22          So what I'll do is we will put 14 jurors in the box.

23   Each side will have three peremptory challenges.  They will be

24   exercised in alternating rounds, with the plaintiffs going

25   first in the first round, the defendants going first in the

D26VPREA                          Argument

 1   second round, and the plaintiff going first in the third and

 2   final round.

 3          If you don't exercise a challenge in a given round,

 4   it's deemed waived; but you don't forfeit your right to

 5   exercise a challenge in a subsequent round.  If all six

 6   peremptories are not exercised, then the lowest seated eight

 7   persons in the box will comprise the jury.

 8          You'll find that I am very liberal when it comes to

 9   excusing jurors for cause.  So I will sometimes do that just

10   *sua sponte*, because obviously my job is to keep nuts off the

11   jury, and every once in a while they pop up.

12          Are there any questions about how jury selection is

13   going to proceed?

14          MR. KADUSHIN:  No, your Honor.

15          MS. SOVA:  No.

16          THE COURT:  All right.

17          We will proceed immediately after jury selection to

18   opening statements.

19          How long do the parties request for opening

20   statements?

21          MR. KADUSHIN:  Approximately 12 minutes, 12 to 13

22   minutes, your Honor.

23          THE COURT:  That's fine.

24          How about the defendant?

25          MS. SOVA:  I would say anything under half an hour,

D26VPREA                          Argument

1    but probably 20 minutes.

2          THE COURT:  No.  Fifteen minutes max each.  I'll give

3    each of you a two-minute warning, meaning when you have two

4    minutes left, I will gently interrupt and tell you to begin to

5    conclude your opening statement.  When we hit 15 minutes,

6    you'll be seated and we'll proceed to the next stage of this

7    case, which is going to be testimony.

8          Your exhibit list is not particularly illuminating to

9    me, but all documents should be premarked, exchanged.  I don't

10   want to hear, except on cross-examination for impeachment

11   purposes, Oh, Judge, I've never seen this before.  I don't know

12   what counsel's got.  Mark, premark, all of your exhibits, even

13   exhibits that you're going to use on cross.  We're not going to

14   sit here and mark exhibits in front of a jury.

15         We will try the case each day from 10 a.m. until 5

16   p.m.  We will take a luncheon recess from 1 until 2 each day.

17   And we'll take a short mid-morning recess of about ten minutes,

18   and a mid-afternoon recess of about ten minutes.

19         I would say that it's just about imperative that we

20   complete the taking of evidence, closing arguments, and

21   instruct the jury by Thursday afternoon.  That will give you

22   the three days that you need, because we won't be working on

23   Tuesday.  Assuming the jury is deliberating on Thursday, then

24   we will sit on Friday during deliberations.

25         Obviously, to the extent that any party has religious

 1   obligations on Friday afternoon, we will conclude at an

 2   appropriate time so that people can get to where they need to

 3   be by Shabbos.  If the jury is still deliberating on Friday at

 4   the close of business, we will resume on Tuesday, because the

 5   following Monday is another court holiday, and there will be no

 6   services here.

 7            So it's very important that we get this case tried

 8   next week in the time that's allotted for it, because otherwise

 9   we're going to run into all kinds of trouble.

10            Do the parties understand?

11            MR. KIRSCHENBAUM:  Yes, your Honor.

12            MR. KADUSHIN:  Yes, your Honor.

13            MR. KIRSCHENBAUM:  One quick thing.

14            Could we have until maybe -- your Honor was planning

15   on addressing this, but could we have until Monday to submit

16   revised jury instructions that are in accordance with your

17   decision today?

18            THE COURT:  Yes.

19            MR. KIRSCHENBAUM:  Okay.

20            And hopefully to the extent we're able to stipulate to

21   a whole bunch of stuff before then, it won't be in there.

22            THE COURT:  Right.

23            MR. KIRSCHENBAUM:  Right.

24            THE COURT:  Should be.

25            MR. KIRSCHENBAUM:  Right.  I agree.

D26VPREA                        Argument

```
1          THE COURT:  This jury instruction should be just
2   laser-like.
3          MR. KIRSCHENBAUM:  How many hours were unpaid.  How
4   many hours were unpaid I think is really the primary issue at
5   this point.
6          THE COURT:  That's it.  Assuming that there's an
7   agreement with respect to the tip pool.
8          MR. KIRSCHENBAUM:  Yes.
9          THE COURT:  And then we'll just present fact questions
10  on a simple verdict sheet.  I don't need a, what, nine-page
11  verdict sheet you submitted?
12         MR. KIRSCHENBAUM:  It will be short, your Honor.
13         THE COURT:  It will be.
14         MR. KIRSCHENBAUM:  Short enough.
15         THE COURT:  And clear.
16         MR. KIRSCHENBAUM:  For anyone to understand.
17         THE COURT:  All right.
18         Now, are there any other issues that counsel want to
19  raise?
20         I wanted the parties here --
21         MR. KIRSCHENBAUM:  I'm sorry?
22         THE COURT:  I wanted the parties here so that they
23  all, each of them, understands exactly what the Court's
24  position is.  And I want each one of them to understand that I
25  am not for one moment going to put up with the kind of nonsense
```

1  that I read in some of these depositions.  And there will be a

2  jury there judging each of you.  And there's enough bad conduct

3  to go all around.

4          And if the plaintiffs open the door with respect to

5  the conduct of your client, if that door is opened, I'm going

6  to let the defendants walk right through it.  And then the jury

7  will really have something to talk about.

8          Now, anything further from the defendants?

9          MS. SOVA:  No, your Honor.

10          THE COURT:  All right.

11          You're free to remain here in the courtroom and

12  discuss this matter this evening.  I'm going to be around.  If

13  there's anything that I can do to facilitate your discussions,

14  you'll call upstairs, all right.

15          I'm going to be here.

16          I'll also tell you just for planning purposes that all

17  of this electronic equipment will be removed from the courtroom

18  before Monday morning, and the extra set of tables will also be

19  removed.  It's just that the antitrust case that I have going

20  on, I have 22 people in the well of the courtroom and everybody

21  is billing.  And they will all be back here tomorrow morning

22  bright and early to continue our work days, which are from 10

23  a.m. until 6:30 p.m.

24          So the courtroom will be reconfigured.

25          Have a good evening.

1           If you need me, I'm here.

2           Stipulate to facts or, better yet, settle the case.

3           There are weaknesses all around this case,

4    notwithstanding the Court's determinations as a matter of law

5    with respect to the summary judgment issues.

6           I'll see you on Monday.

7           MR. KIRSCHENBAUM:  Thank you, your Honor.

8           MR. POHL:  Thank you, Judge.

9                            *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25